

ORIGINAL

# SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
JUL 2 3 2014
CLERK, U.S. DISTRICT COURT
By _____
Deputy

UNITED STATES OF AMERICA

v.

JOHN WILEY PRICE (01)
   a.k.a John Wiley Price III
KATHY LOUISE NEALY (02)
DAPHENY ELAINE FAIN (03)
CHRISTIAN LLOYD CAMPBELL (04)

NO. **3 - 14 CR - 2 9 3 - M**

**FILED UNDER SEAL**

## INDICTMENT

The Grand Jury Charges:

## INTRODUCTION

At all times material to this indictment:

## A.   DALLAS COUNTY, TEXAS

1.     Dallas County, Texas was a political subdivision of the State of Texas, divided into four geographic precincts also known as "districts."

2.     A five-member Commissioners Court was the primary governing body of Dallas County.  The Court was composed of four Commissioners, one elected from each district, and a County Judge elected countywide.

3.     The Commissioners Court presided over a variety of official matters, including awarding county contracts through a competitive bidding process, building and maintaining roads and bridges within each County district, and controlling expenditures

of County funds including those that the County received from federal programs involving grants, contracts, subsidies, loans, guarantees, insurance, or other forms of federal assistance. The Commissioners Court also set the County tax rate, adopted the County budget, oversaw the administration of the County government, appointed boards and commissions, reviewed and/or approved grants and personnel actions, approved the budget of and set the tax rate for the hospital district, and exercised authority over the budget of most departments, including those headed by other elected officials.

## B.    DEFENDANTS

4.    Defendant **JOHN WILEY PRICE** was an elected County Commissioner of the Dallas County Commissioners Court for District 3 in Dallas County, Texas, in the Northern District of Texas, from 1985 through the present. **Price** oversaw the daily operations of Road and Bridge District 3. He was also actively involved in the decision-making related to and the direction of the County's information technology (IT) systems and services, serving on the County's IT Steering Committee that met regularly to discuss current IT issues, concerns, budgeting, and potential and upcoming IT projects and needs. The IT Steering Committee also received briefings from County departments, and it shared information with and made recommendations to the Commissioners Court.

5.    Each elected term, **Price** took an oath specific to County Commissioners and Judges, in which he swore and affirmed:

> I, John Wiley Price, do solemnly swear (or affirm) that I will not be, directly or indirectly, interested in any contract with or claim against the County, except such contracts or claims as are expressly authorized by law

and except such warrants as may issue to me as fees of office.  So help me God.

6.      **Price** also took an official oath and affirmation to faithfully execute the duties of a County Commissioner, as well as to preserve, protect, and defend the Constitution and laws of the United States and the Constitution and laws of the State of Texas, as required by the Texas Constitution, Article 16, Section 1.  Included among the state and local laws that **Price** promised to uphold, and those applicable to County Commissioners, was Texas Penal Code, Section 36.02(a)(1) and (3), which provided, in part, that

> a person commits the offense of bribery if he intentionally and knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another:
>
> (1) any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant; or
> …
> (3) any benefit as consideration for a violation of a duty imposed by law on a public servant.

7.      Under these state laws and under his oaths of office, **Price** owed a duty of honest and faithful services to Dallas County, Texas and its citizens.

8.      Texas Local Government Code, Chapter 159 and Texas Government Code, Chapter 572 required **Price** to file a financial statement under oath disclosing his financial activity that included, among other things:

> a.  occupational income and rental income;
> b.  interests in businesses, real property, and business entities; and
> c.  gifts or things of value over $250 from anyone other than a close family member.

9.    Similarly, **Price** was required to disclose all sources of income generated outside of county employment pursuant to Dallas County Commissioners Court Order 2011-507 and Texas Local Government Code, Chapter 159.

10.    Defendant **KATHY LOUISE NEALY** was a local lobbyist who did business under both a sole proprietorship, Kathy L. Nealy & Associates (KLNA), and a Texas corporation, KNI, Inc. (KNI).    **Nealy** operated both companies from an office as well as her home in Dallas County, Texas, in the Northern District of Texas.  **Nealy** was also registered with the City of Dallas as a lobbyist.

11.    **Nealy** advertised her services to include "political consulting" and "business consulting" for clients such as "business tycoons" and local politicians, including **Price** for each of his campaigns for County Commissioner.  As part of her campaign work for **Price**, **Nealy** organized and hosted fundraisers at an art gallery, *Business M* (a business known to the Grand Jury).  **Nealy** promised KLNA clients "access to contacts" necessary to "get the job done."

12.    Among **Nealy's** business clients were vendors seeking contracts with Dallas County and businesses pursuing other matters on which **Price** voted in Commissioners Court.

13.    **Nealy** often arranged meetings, lunches, and dinners with **Price** for her business clients that had matters in front of the Commissioners Court, many occurring during periods when contact with elected officials and other county employees was prohibited because the selection process for bids on county contracts was in progress at

the time. **Price** sponsored and advocated for the interests of **Nealy's** clients and voted on these matters in a manner that benefited them, while accepting a stream of financial benefits from **Nealy** totaling approximately $950,000.

14.     Defendant **CHRISTIAN LLOYD CAMPBELL** was a commissioned account manager with one of **Nealy's** business clients until approximately mid-2004. At that time, **Campbell** also began consulting under a sole proprietorship he created, Campbell Consulting Group (CCG). He and **Nealy** simultaneously contracted as "consultants" with several of the same companies that submitted bids for Dallas County contracts, often with nearly identical contract terms. To maintain favor with **Price**, on several occasions, **Campbell** successfully persuaded vendors to hire **Nealy** or to renew her contracts for subsequent years.

15.     Defendant **DAPHENY ELAINE FAIN**, a Dallas County employee, worked for **Price** beginning in 1995, first as a secretary, later as his executive assistant, and finally, as his chief of staff, through the date of this indictment.

## C.     DALLAS COUNTY CONTRACT BIDDING PROCESS

16.     From January 2001 through 2011, Dallas County invited vendors to bid for contracts to provide services that included IT services and equipment, digital imaging and indexing of records, inmate telephone service, collection of Justice of the Peace Court fines, and others. The process would begin when the Commissioners Court voted to issue a Request for Proposals (RFP) or a Request for Qualifications (RFQ). These requests were invitations for companies to submit their proposals and qualifications for providing

a specific product or service to the County and at what cost. Once submitted, an evaluation committee (also known as a selection committee) composed of county employees would review, score, and recommend to the Commissioners Court which vendors should advance in the bidding process. The Commissioners Court would then vote on whether to accept or reject the committee's recommendations. Frequently, the Commissioners Court would vote to narrow the bidders to a smaller group of four to six companies, all of which would submit a second bid that would be their "Best and Final Offer" (BAFO). The evaluation committee would again review and score the bids and recommend a final bidder to the Commissioners Court. The Court then voted on whether the County should enter into contract negotiations with the selected bidder. After negotiations were finalized, the Court voted again to authorize the County Judge to sign the contract with the chosen vendor. If the County could not reach an agreement with the selected vendor, the County could choose to end negotiations with that vendor and begin negotiating with the next most-qualified vendor until a contract was awarded.

17.     State and local law dictated certain procedures to safeguard the confidentiality of the proposals' contents, prevent disclosure to competing offerors, and keep the information secret during negotiations between potential vendors and the County. These included:

a.     Texas Local Government Code, Section 262.0225, Additional Competitive Procedures, which stated, in part:

> (a) In the procedure for competitive bidding under this subchapter, the commissioners court of the county shall provide all bidders with the

opportunity to bid on the same items on equal terms and have bids judged according to the same standards as set forth in the specifications.

(b) A county shall receive bids or proposals under this subchapter in a fair and confidential manner.

    b.    Texas Local Government Code, Section 262.030, Alternative Proposal Procedure for Insurance, High Technology Items, and Special Services, which stated, in part:

If provided in the request for proposals, proposals shall be opened so as to avoid disclosure of contents to competing offerors and kept secret during the process of negotiation. All proposals that have been submitted shall be available and open for public inspection after the contract is awarded, except for trade secrets and confidential information contained in the proposals and identified as such.

    c.    Chapters 74 and 86 of the Dallas County Code, which addressed confidentiality and required that

all information protected by state statute concerning county business must be held in strict confidence and must not be discussed with others on or off the job except for purposes of necessary county business (Section 74-743); and

all information concerning county business must be held in strict confidence and must not be discussed with others except for purposes of necessary county business (Section 86-753).

    18.    To enforce and comply with Texas law and Dallas County's local code and transparency policy, Dallas County included in many of its RFPs and RFQs provisions that prohibited bidders, including agents and representatives, from directly discussing or promoting their proposals with any member of the Commissioners Court or staff during the selection process, except in county-sponsored inquiries, briefings, interviews, or

presentations with the Commissioners Court. This "no-contact period," also known as a "quiet period," was in place to ensure objectivity and fairness, to keep bidder information confidential, and to avoid improper or undue influence on the competitive bidding process.

19.    Additionally, the RFPs and RFQs included conflict-of-interest provisions that prohibited County Commissioners and County employees from having "any financial interest, direct or indirect, in any contract with the County" and from being "financially interested, directly or indirectly, in the sale to the County of any land, materials, supplies, or services," except on behalf of the County as an official or employee.

## D.    FOREIGN TRADE ZONE DESIGNATION PROCESS

20.    In or about 2005, various property owners in **Price's** district became interested in developing an area that would accommodate companies involved in international trade through importing, re-exporting, and/or assembling foreign goods. A useful amenity for such businesses was to have the property designated as a foreign trade zone (FTZ), an area physically located within the United States but considered outside U.S. Customs territory. FTZs were designed to create jobs in the local FTZ area rather than off-shore. Businesses located within an FTZ received economic benefits that included (a) not having to pay duties on imported merchandise until it left the FTZ and entered the U.S. market; (b) not having to pay any duties if the imported merchandise was re-exported; (c) paying a lower tariff on unfinished or unassembled items later

incorporated into a final product; and (d) not having to pay local property taxes on inventory that was imported or that was to be exported.

21.     The Federal Foreign Trade Zones Board (FTZB), an interagency board consisting of the U.S. Secretary of Commerce and the U.S. Secretary of the Treasury, held the authority to grant requests for FTZ designation. To obtain FTZB approval for property in Dallas County, an application had to be submitted to the Dallas/Fort Worth International Airport Board, which held the entitlement FTZ grant in the North Texas area and was the agency responsible for reviewing and approving such applications before presenting them to the FTZB for its approval.

22.     Among other things, the application had to identify the particular properties for which FTZ status was sought. The properties were not required to be adjacent to one another, but were expected to be in the same general geographical area with common attributes. In many cases, before an application was finalized, a public hearing was held or other public notice was issued to advertise the development of the application, to determine the interest of other area property owners or parties in joining the application, and to gauge the support of elected officials and potentially affected businesses in the area.

23.     In addition to a catalog of properties and the proposed zone configuration, the application also had to include consent letters from each potentially-impacted local taxing authority – including cities, counties, and school districts – expressing support for the FTZ designation as to each proposed property. For FTZ applications related to land

in Dallas County, the Commissioners Court voted to grant or withhold consent for the proposed FTZ on behalf of Dallas County as a taxing authority. After the FTZB granted final approval for a particular FTZ, businesses located in that zone were able to "activate" their facilities with U.S. Customs to take advantage of the FTZ status.

## Count One
### Conspiracy to Commit Bribery Concerning
### a Local Government Receiving Federal Benefits
### (Violation of 18 U.S.C. § 371 (18 U.S.C. § 666(a)(1)(B) and (a)(2))

24.     The allegations set forth in paragraphs one through twenty-three of this indictment are realleged and incorporated as if fully set forth herein.

25.     Dallas County was a local government that received benefits in excess of $10,000 in each of the consecutive fiscal one-year periods beginning October 1, 2000 and continuing through October 1, 2010, under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance.

26.     As the Dallas County Commissioner for District 3, **Price** was an agent of Dallas County, Texas.

### The Conspiracy and Its Objects

27.     Beginning in or about January 2001 and continuing through on or about June 27, 2011, in the Dallas Division of the Northern District of Texas, **John Wiley Price**, **Kathy Louise Nealy**, and **Christian Lloyd Campbell**, the defendants, together with others known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree together and with each other to give and receive corrupt payments in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2).

28.     It was a part and an object of the conspiracy that **Price** would and did corruptly solicit and demand for the benefit of any person, and accept and agree to accept things of value through a stream of financial benefits, directly and indirectly, from **Nealy** and **Campbell** and others known and unknown to the Grand Jury, intending to be

influenced and rewarded in connection with any Dallas County business, transaction, and series of transactions involving anything of value of $5,000 or more, as specific opportunities arose, in violation of Title 18, United States Code, Section 666(a)(1)(B).

29.     It was also a part and object of the conspiracy that **Nealy** and **Campbell** and others known and unknown to the Grand Jury would and did corruptly give, offer, and agree to give things of value through a stream of financial benefits, directly and indirectly, to **Price** with the intent to influence and reward **Price** in connection with any Dallas County business, transaction, and series of transactions involving anything of value of $5,000 or more, as specific opportunities arose, in violation of Title 18, United States Code, Section 666(a)(2).

30.     It was also a part and object of the conspiracy for **Price**, **Nealy**, **Campbell**, and others known and unknown to the Grand Jury to unjustly enrich themselves as well as to furnish funds to **Nealy** to continue funneling things of value through a stream of benefits to **Price**.

### Manner and Means of the Conspiracy

To achieve unlawful objects of the conspiracy, **Price**, **Nealy**, and **Campbell** used the following manner and means, among others:

31.     During a period that included the years beginning in or about 2001 to in or about June 2011, **Nealy** obtained lobbying or consulting agreements with businesses seeking contracts with Dallas County or that had other business matters in Dallas County on which the Commissioners Court voted.  These businesses knew that **Nealy** had access

to and influence with **Price**.  At some point in the process, these businesses would hire

**Nealy**, and through **Nealy**, they would obtain inside information about competitors' bids

and other strategically helpful information, which they used to pursue and obtain

lucrative contracts with Dallas County.  These businesses often continued to pay **Nealy**

for the duration of the businesses' dealings in Dallas County, so that, in exchange, **Price**

would continue to take beneficial actions on their behalf in his capacity as a County

Commissioner, including providing non-public internal Dallas County memos, emails,

and discussions about issues that arose during the performance of such contracts;

advocating on their behalf to the Commissioners Court, to committees on which **Price**

served including the IT Steering Committee, to the County's Purchasing Department, and

to others; approving additional necessary funding on their contracts; providing

information as to contemplated RFPs or contract renegotiations under consideration by

Dallas County; and refraining from voting in a negative manner or otherwise taking

positions on issues that would negatively impact the businesses' interests.

32.     **Campbell** often contracted as a consultant with several of the same

companies as **Nealy**, often with nearly identical contract terms.  Together with **Price**,

**Campbell** facilitated **Nealy's** continued employment with these businesses by promoting

her to them and compelling the renewal of her contracts.  **Campbell** also ensured that

**Nealy's** monthly fees were paid, paying her out of his own compensation when

necessary, and he sometimes wrote status reports for **Nealy** so that she could insert the

information into her own invoices and ostensibly appear to be providing all of the services called for in her contracts.

## A.     CORRUPT PAYMENTS AND BENEFITS TO PRICE

33.     While earning income from her lobbying agreements with such vendors and companies, **Nealy** provided a stream of financial benefits to **Price** in the form of money, cars, and land, totaling approximately $950,000.

### *Money*

a.     **Nealy** paid **Price** approximately $447,217 in the form of checks, cash, and transfers from **Nealy's** bank accounts to **Price's** bank accounts.

### *Cars*

b.     **Nealy** also provided to **Price** the full use of a new Chevrolet Avalanche approximately every four years and a BMW 645Ci convertible, which **Nealy** titled and insured in her name and on which she made monthly car payments and insurance premium payments, all totaling approximately $191,130.

### *Land*

c.     **Nealy** secretly funneled approximately $198,284 to **Price** through four purchases of real property for **Price**, with **Nealy** serving as a straw purchaser. **Nealy** paid for the properties' purchase, monthly mortgage payments, property taxes, insurance, and repairs. The properties included a parcel of land referred to as the "Canton" property in Van Zandt County, and three adjacent lots located on South Lancaster Road in Dallas

(***2, ***8, and ***0 S. Lancaster Road, the locations of which are known to the Grand Jury).

### *Rental income*

d.   **Nealy** provided **Price** rent payments totaling approximately $113,600 from a tenant occupying a building at one of the Lancaster Road properties and operating as *Business T* (a business known to the Grand Jury).

34.   **Price** received the following concealed financial benefits from **Nealy**:

| Date | Financial Benefit to Price | Approximate Amount |
|------|---------------------------|--------------------|
| Calendar year 2001 (beginning late 2001) | Money paid to **Price** by **Nealy** | $11,500 |
| Calendar year 2002 | Money paid to **Price** by **Nealy** | $111,320 |
| Calendar year 2003 | Money paid to **Price** by **Nealy** | $66,359 |
| Calendar year 2004 | Money paid to **Price** by **Nealy** | $72,887 |
| Calendar year 2005 | Money paid to **Price** by **Nealy** | $25,948 |
| Calendar year 2006 | Money paid to **Price** by **Nealy** | $22,000 |
| Calendar year 2007 | Money paid to **Price** by **Nealy** | $66,170 |
| Calendar year 2008 | Money paid to **Price** by **Nealy** | $25,089 |
| Calendar year 2009 | Money paid to **Price** by **Nealy** | $26,539 |
| Calendar year 2010 | Money paid to **Price** by **Nealy** | $10,305 |
| Calendar year 2011 (through June 27) | Money paid to **Price** by **Nealy** | $9,100 |
| 2002 to 2006 | New 2002 Chevrolet Avalanche paid for by **Nealy** | $23,690 |

| Date | Financial Benefit to Price | Approximate Amount |
|---|---|---|
| 2006 to 2010 | New 2007 Chevrolet Avalanche paid for by **Nealy** | $36,362 |
| 2010 to June 2011 | New 2010 Chevrolet Avalanche paid for by **Nealy** | $9,079 |
| 2004 to June 2011 | New 2005 BMW 645Ci paid for by **Nealy** | $105,493 |
| 2002 to June 2011 | Vehicle insurance costs paid by **Nealy** | $16,506 |
| 2003 to 2008 | Purchase of ***2 S. Lancaster Road and loan payments paid by **Nealy** | $46,129 |
| 2003 | Purchase of ***0 S. Lancaster Road paid by **Nealy** | $6,502 |
| 2004 | Purchase of ***8 S. Lancaster Road paid by **Nealy** | $6,600 |
| 2002 to 2007 | Purchase of Canton property and loan payments paid by **Nealy** | $94,930 |
| 2002 to June 2011 | Property taxes and insurance for Lancaster Road and Canton properties paid by **Nealy** | $44,123 |
| 2003 to June 2011 | Rental payments from *Business T* at S. Lancaster Road | $113,600 |
| **2001 to June 27, 2011** | **Total stream of financial benefits provided to Price:** | **$950,231** |

35.     These payments and benefits described in paragraphs 33 and 34 were made

in furtherance of the conspiracy and to achieve its objects, and to influence and reward

**Price** to take action or refrain from taking negative action, as specific opportunities arose,

to benefit **Nealy's** and **Campbell's** clients in connection with their pursuit of Dallas County contracts or other matters voted upon by the Dallas County Commissioners, each of which was valued at $5,000 or more.

### *Concealment*

36.     To conceal the fact that **Price** was the intended recipient of this continuous stream of bribe payments, as well as the high number of checks and large quantity of money **Nealy** provided to him, **Nealy** would transfer money from her accounts to **Price's** accounts and write checks payable (a) to financial institutions at which **Price** held accounts; (b) to herself, which **Nealy** then endorsed and gave to **Price**, sometimes with "salary" written in the memo line; and (c) directly to **Price**, with various notations in the memo line in an effort to conceal the true illegal purpose of such payments.

37.     **Nealy** also paid **Price** by endorsing over to **Price** third party checks payable to herself or KLNA, which **Price** cashed or deposited in his own accounts.

38.     **Nealy** wrote such checks from nine different business, personal, and investment accounts that **Nealy** opened for herself, KLNA, and KNI in an effort to conceal the volume and dollar value of the checks she provided to **Price**.

**B.    BENEFITS TO OTHER PERSONS CORRUPTLY SOLICITED AND DEMANDED BY PRICE**

39.    In addition to the above-described financial benefits for himself, **Price** corruptly solicited and demanded a series of benefits for other persons, with the intent to be influenced and rewarded in connection with any Dallas County business, transaction, and series of transactions involving anything of value of $5,000 or more, as specific opportunities arose.  These benefits included:

a.    having vendors enter into or renew consulting agreements with **Nealy** so that **Nealy** would (i) personally benefit from the compensation provided under the contracts and (ii) have the means to continue funneling a stream of financial benefits and other things of value to **Price**;

b.    hiring and promoting certain individuals known to the Grand Jury, including C.K., the daughter of a Texas politician and close friend of **Price**, and H.T., who, while employed by a **Nealy** business client, championed the renewal of **Nealy's** contract and covertly increased **Campbell's** pay so **Campbell** could pay **Nealy** during an RFP selection period; and

c.    granting particular minority subcontractors specified by **Price** a certain percentage of the bids submitted for contracts in Dallas County and other jurisdictions, including *Business O* and *Business Q* (businesses known to the Grand Jury).

**C.    PRICE'S FAVORABLE OFFICIAL ACTIONS**

40.    In furtherance of the conspiracy and to effect its objects, **Price**, while he was receiving this stream of benefits, took or agreed to take a series of favorable actions

or to refrain from taking negative actions, as specific opportunities arose, concerning matters that clients of **Nealy** and **Campbell** had before the Dallas County Commissioners Court, including, among others:

      a.     On multiple occasions, **Price** leaked to **Nealy** and **Campbell** confidential information related to specific RFPs that was contained in bidders' materials, internal Dallas County memoranda, and other documents concerning details of bidders' pricing, minority subcontractor participation, bid-evaluation scoring and other results, and Dallas County personnel and committee recommendations.

      b.     **Price** leaked internal Dallas County documents and information to **Nealy** and **Campbell** about potential Dallas County projects prior to the County's issuing publicly available RFPs, to provide **Nealy's** clients a strategic advantage when pursuing Dallas County opportunities.

      c.     During the no-contact period of the bidding process, **Price** met with or otherwise communicated with **Nealy**, **Campbell**, and their clients that had submitted proposals in response to Dallas County RFPs.

      d.     In briefings, committee meetings, discussions with other Commissioners, and Commissioners Court sessions, **Price** advocated and voted in favor of or against actions in a manner that benefited **Nealy's** and **Campbell's** clients, including, among others, whether to: (i) advance **Nealy's** and/or **Campbell's** clients forward in the vendor selection process; (ii) award Dallas County contracts to **Nealy's** and/or **Campbell's** clients; (iii) authorize extensions, modifications, renegotiations, or additional funding of

existing contracts with **Nealy's** and **Campbell's** clients; and (iv) consent to or delay FTZ designations for land developments located in **Price's** district.

41.     **Price** acted favorably on behalf of, or refrained from opposing, the following businesses represented by **Nealy** and **Campbell**, among others:

### *Business S*

42.     *Business S*, an IT Services company known to the Grand Jury, conducted interstate and international business, including in the Dallas Division of the Northern District of Texas.

43.     From approximately 2001 to 2004, *Business S* pursued contracts with Dallas County related to IT services.  Among the IT contracts that *Business S* pursued was the IT Outsourcing RFP No. 2002-011-1007.  The County issued the RFP in October 2001 on **Price's** motion, seeking a vendor to provide comprehensive IT services for all Dallas County offices, including data management, network management, telecommunications services, help-desk service, disaster recovery, and equipment maintenance.

44.     *Business S*, one of five responding vendors, submitted its bid on December 17, 2001.  **Campbell** was employed by *Business S* as an account manager assigned to handle Dallas County matters at the time.  After submitting a bid, *Business S* retained **Nealy** for her access to and influence with **Price** to persuade him to sponsor *Business S* in the selection process and to provide information helpful in pursuing the contract.  **Price** made several motions in Commissioners Court that advanced *Business S* through the

selection process, and he voted to award it the IT Outsourcing RFP. *Business S* held the contract until approximately mid-2004, when it sold most of its IT services assets to *Business A* (a company known to the Grand Jury).

45.   **Nealy** initially agreed to assist *Business S* in advancing past the first Commissioners Court vote to decide which competing vendors would proceed forward in the RFP process. For this assistance, she charged *Business S* $60,000, paid in eight $7,500 installments. After *Business S* advanced to the next RFP stage, it again hired **Nealy**, paying her $5,000 per month plus a "success" fee if Dallas County awarded it the IT Outsourcing contract. Thereafter, through approximately 2004, *Business S* renewed or extended new contracts to **Nealy** for providing "direct communication to appropriate decision makers" including "elected officials and staff"; providing "timely and relevant information [to *Business S*] regarding critical success factors"; and assisting *Business S* in its efforts to be "short-listed" and/or awarded future contracts, including the County's potential Oracle upgrade and IT outsourcing for Parkland Hospital, under the County's consideration at that time. **Nealy** also promised to "leverage established contacts at Dallas County to assure that [*Business S*] enjoys an excellent relationship throughout current contracts [sic] primary term." *Business S* paid **Nealy** a total of approximately $258,000 under her consulting agreements through 2004.

46.   **Price**, having accepted and agreed to accept the stream of financial benefits from **Nealy** described in paragraphs 33 and 34, took actions as specific opportunities arose that advanced *Business S*'s interests, including:

    a.    **Price** made a motion and voted in favor of advancing *Business S* forward in the IT Outsourcing RFP process in February 2002, which allowed *Business S* to submit a presentation to the Commissioners Court and a BAFO for the contract.

    b.    **Price** made a motion and voted in favor of selecting *Business S* as the preferred IT Outsourcing vendor with whom to begin contract negotiations in late April 2002.

    c.    **Price** made a motion and voted in favor of approving the IT Services Master Agreement and fourteen Service Level Agreements between Dallas County and *Business S* in May 2002.  The combined agreement was a five-year contract worth approximately $40 million, with the option of two 1-year extensions.

    d.    **Price** signed a recommendation letter for *Business S* in January 2003, praising the company's work in Dallas County, when *Business S* was pursuing public sector contracts in Florida and elsewhere.

    e.    **Price** seconded a motion and voted to approve *Business S* to perform an Oracle upgrade assessment for the County in June 2003, at a cost of approximately $200,000.

    47.    While **Price** publicly advocated for and sponsored *Business S* in the above-described manner, **Price, Nealy,** and **Campbell** conducted secret, concealed transactions to advance *Business S*'s interests and to unlawfully enrich themselves and others known to the Grand Jury, conduct they hid and attempted to hide from Dallas County, RFP selection committee members, the IT Steering Committee, members and employees of

the Commissioners Court, competing vendors, and Dallas County citizens.  These transactions included the following acts, among others:

a.  **Nealy** paid **Price** approximately $218,000 in more than 70 separate financial transactions.

b.  **Price** accepted from **Nealy** the new 2002 Avalanche and 2005 BMW described in paragraphs 33 and 34 for his use and control, while **Nealy** made car payments totaling approximately $18,000 during the span of her *Business S* contracts.

c.  **Nealy** spent approximately $89,000 for the purchases of and monthly loan payments for the Canton and Lancaster Road properties for **Price**, as described in paragraphs 33 and 34.

d.  **Price**, directly and through **Campbell**, forced *Business S* to renew **Nealy's** expired March 2003 contract by (i) arranging meetings with *Business S* managers, (ii) writing letters to *Business S* senior executives using veiled language, including one in which he referenced a "deviation on … promises made in the outset of this venture," and (iii) emailing upper management to address this concern.

e.  At **Price's** insistence, and with pressure from **Nealy** and **Campbell**, in early May 2003, *Business S* hired C.K., an individual whom **Campbell** noted in an email was the daughter of a certain politician and "close personal friend of Commissioner Price."

f.  **Price**, through **Nealy** and **Campbell**, pressured *Business S* to award subcontractor agreements to specific minority companies identified by **Price**, including

*Business Q*, for contracts *Business S* sought in other jurisdictions unrelated to Dallas County.

      g.    **Price** leaked to **Nealy** internal Dallas County documents about the County's IT projects and needs, budget information, and recommendations about the County's potential courts-management systems project and others that *Business S* was pursuing during the span of its consulting contracts with **Nealy**.

      h.    **Nealy's** payments to **Price** included money transfers or cash withdrawals from **Nealy's** accounts deposited into **Price's** accounts, **Nealy's** split-deposits of third-party checks between her accounts and **Price's**, and checks from **Nealy** that **Price** cashed in exchange for stacks of $100 bills. **Nealy's** stream of payments to **Price** included transactions during the IT Outsourcing RFP selection period, such as, for example:

      (1)    One month before **Price** moved to advance *Business S* forward in the IT Outsourcing RFP process, **Nealy** paid **Price** $3,000 by transferring funds from her KLNA business account into **Price's** account at City Bank in Forney, Texas, where she and **Price** both held accounts.

      (2)    **Nealy** paid **Price** another $5,000 in the month following this vote.

      (3)    The day before *Business S*'s presentation to the Commissioners Court, **Nealy** paid **Price** $2,500.

      (4)    One week after the presentation, **Nealy** paid **Price** an additional $5,000 in cashiers checks **Nealy** bought from City Bank.

(5)     Three days before *Business S* submitted its BAFO, **Nealy** paid **Price** $4,500 by directing City Bank to split-deposit a $7,000 third-party check payable to her company, KLNA, as follows:  $4,500 into an account **Price** held in a nominee name (of a family member) over which he had sole control, $1,000 into **Nealy's** personal account, and $1,500 in cash.

(6)     Four days before **Price** made a motion in Commissioners Court to select *Business S* as the preferred IT Outsourcing vendor and begin contract negotiations, **Nealy** paid **Price** $10,000 by writing two separate, sequentially-numbered $5,000 checks to **Price** from her KLNA business account, dated the same day.

(7)     On the same day that **Price** made a motion in Commissioners Court to approve the IT Services Master Agreement and fourteen Service Level Agreements between Dallas County and *Business S*, **Nealy** paid **Price** $2,500 by transferring the funds from her KLNA account to **Price's** nominee account at City Bank.

### Business A

48.     *Business A* was an IT services company that conducted interstate and international business, including in the Dallas Division of the Northern District of Texas.

49.     In mid-December 2003, *Business S* advised Dallas County that it planned to sell most of its IT services assets to *Business A* and that the current president of that division of *Business S* and all personnel supporting the IT Outsourcing contract would be

retained by *Business A*.  In June 2004, on **Price's** motion, Dallas County consented to this

change and amended its contract to substitute *Business A*.  *Business A* provided services

to Dallas County until the conclusion of its contract in approximately October 2007.

50.     Upper management that transitioned from *Business S* to *Business A* adopted

**Nealy's** $5,000 monthly consulting agreement previously signed with *Business S*.  Based

on **Nealy's** proven in-roads with **Price** in prior years, *Business A's* management

continued to renew **Nealy's** contract with the expectation that she would provide access

to and influence with **Price** to (a) help secure future Dallas County contracts, including a

contract to upgrade Dallas County's Oracle Financials system, and (b) maintain a

favorable relationship with **Price** concerning its existing contract with Dallas County at

that time.  When *Business A's* IT contract with Dallas County ended in approximately

October 2007, *Business A* terminated **Nealy's** contract.  *Business A* paid **Nealy**

approximately $229,000 from June 2004 to 2007.

51.     **Campbell** remained employed as a commissioned account manager for

several months following the transition to *Business A*, identifying himself as *Business A's*

point of contact in its March 2004 proposal to Dallas County for the Oracle upgrade

mentioned in **Nealy's** contract.  Then, in approximately June 2004, **Campbell** ended his

tenure as an employee and became a consultant for *Business A* under an agreement

similar to **Nealy's**, with a $7,500 monthly fee and a commission for each contract he

procured.  In mid-2007, *Business A* renewed **Campbell's** consulting contract with a

$5,000 monthly fee and commissions.

52.     **Price**, having accepted and agreed to accept the stream of financial benefits from **Nealy** described in paragraphs 33 and 34, took actions as specific opportunities arose that advanced *Business A*'s interests, including:

a.      **Price** made a motion and voted in favor of accepting the change of control from *Business S* to *Business A* and amending the IT Outsourcing contract to reflect *Business A* as the vendor in June 2004.

b.      **Price** granted meetings with *Business A* management, **Nealy**, and **Campbell** concerning *Business A*'s performance of its contracts and other issues that arose during that time.

c.      **Price** advocated on behalf of *Business A* to fellow Commissioners, IT Steering Committee members, and others concerning *Business A*'s performance of its contracts and other issues that arose during that time.

53.     While **Price** publicly advocated for and sponsored *Business A* in the above-described manner, **Price**, **Nealy**, and **Campbell** conducted secret, concealed transactions to advance *Business A*'s interests and to unlawfully enrich themselves and others known to the Grand Jury, conduct they hid and attempted to hide from Dallas County, RFP selection committee members, the IT Steering Committee, members and employees of the Commissioners Court, competing vendors, and Dallas County citizens.  These transactions included the following acts, among others:

a.      During the negotiations between the County and *Business A* regarding the contract terms under which *Business A* would assume *Business S*'s IT Outsourcing

contract, **Nealy** and **Price** shared and discussed internal County information and *Business A*'s responses to such information.

 b. **Price** met with **Nealy** privately to share inside Dallas County information about *Business A* and had staff members fax and email internal Dallas County documents summarizing discussions about *Business A*'s performance with the County.

 c. **Nealy** paid **Price** on or near dates on which her calendar reflected meetings with **Price** concerning *Business A*.

 d. Approximately six days before a November 2004 Dallas County meeting attended by **Price** to discuss issues related to *Business A*'s performance, **Nealy** purchased a 2005 BMW that she provided to **Price** for his use.

 e. **Price** also accepted from **Nealy** the 2007 Avalanche described in paragraphs 33 and 34 for his use and control, while **Nealy** made car payments totaling approximately $81,000 during the span of her *Business A* contracts.

 f. **Nealy** spent approximately $148,000 on the four properties she bought for **Price**, described in paragraphs 33 and 34.

 g. Throughout the period of **Nealy's** contracts with *Business A*, **Nealy** paid **Price** approximately $153,000 in more than 45 separate financial transactions, including checks from **Nealy** that **Price** deposited into his nominee account at City Bank or cashed in exchange for stacks of $100 bills, and checks that **Nealy** wrote to herself or to Dallas Telco and gave to **Price** to cash or deposit.

### *Business B*

54.     *Business B* was a company known to the Grand Jury that conducted

interstate business, including in the Dallas Division of the Northern District of Texas.

55.     During a period that included the years 2004 through 2009, *Business B*

pursued contracts with Dallas County related to, among other things, digitizing County

records and countywide cashiering services.  One such contract was the Dallas County

Recording, Indexing, and Imaging RFP No. 2004-064-1485, issued by the County in or

about March 2004, seeking a vendor to digitize Dallas County Clerk's Office records

(hereinafter, DCRIIS RFP).  Bids were due from vendors on April 19, 2004.

56.     The DCRIIS RFP contained a "no-contact" provision in effect during the

selection process that prohibited firms from contacting County staff and prohibited "firms

and their employees of related companies, including paid or unpaid personnel acting on

their behalf," from contacting or participating in "any type of contact outside the County

offices with County employees, including elected officials."  To further safeguard the

confidentiality of bidders' information, the RFP also relayed that "all Proposal

Information, including detailed price and cost information, shall be held in confidence

until the contract is awarded and/or cancelled."

57.     Initially, **Nealy** teamed with *Business B* as a subcontractor for the DCRIIS

RFP.  **Nealy** was to provide "an outreach and education program" that involved

providing marketing materials to the public and training to users of the indexing and

imaging system.  After submitting its initial proposal to the County, *Business B*

negotiated with **Nealy** as to how much it would pay her for her piece of the contract, at one point offering her $50,000.

58.    **Campbell** signed a consulting agreement with *Business B* shortly before the company submitted its proposal to Dallas County.  Mirroring **Nealy's** 2004 contract with *Business S*, **Campbell** promised to "leverage established relationships at Dallas County" to help *Business B* win the DCRIIS contract, in exchange for $5,000 monthly payments to **Campbell** and a $25,000 success fee.

59.    On **Price's** motion, *Business B* advanced to the second round of the RFP process with three other vendors in late May 2004.  *Business B* presented a demonstration of its proposed system to the selection committee the following month.  After vendor presentations, however, the selection committee recommended eliminating *Business B* and a second bidder from further consideration, noting in a confidential memo to the Commissioners Court that *Business B*'s bid included a costly marketing proposal.

60.    **Price** convinced fellow Commissioners to reject the DCRIIS selection committee's recommendation.  On **Price's** motion, the Commissioners Court voted to keep *Business B* in the selection process and move forward with three other vendors for the DCRIIS RFP, thereby deviating from the typical RFP process.

61.    *Business B* ultimately submitted the lowest BAFO without the marketing piece of its proposal and without **Nealy** as a subcontractor, due to the County's comments that the RFP did not call for a marketing program.  *Business B* was selected as the DCRIIS RFP finalist in late January 2005.  It signed a five-year contract with the County,

worth approximately $3.2 million, in late March 2005, which it held until in or about 2009.

62.     After eliminating **Nealy** as a subcontractor in its BAFO, *Business B* hired her as a lobbyist at the local government level for a $4,000 monthly fee and additionally paid her approximately $50,000 to market its services.  It also renewed **Campbell's** consulting contract.  The company continued to retain **Nealy** until 2008, but ended **Campbell's** contract in approximately February 2007.  In internal discussions regarding whether to renew **Nealy's** yearly contract, one *Business B* manager advocated in favor of it, noting that **Nealy** "is very close to the strongest Commissioner, Commissioner **Price**" and very close to a partner in *Business L*, another Dallas County vendor (known to the Grand Jury) with which *Business B* was seeking to do business.

63.     In total, **Nealy** was paid approximately $197,000 from *Business B*.

64.     **Price**, having accepted and agreed to accept the stream of financial benefits from **Nealy** described in paragraphs 33 and 34, took actions as specific opportunities arose that advanced *Business B*'s interests, including:

a.      **Price** made a motion and voted in favor of advancing *Business B* forward to the second step of the DCRIIS RFP process involving product demonstration in May 2004.

b.      **Price** successfully advocated for *Business B* to remain in the selection process, convinced fellow County Commissioners to reject the DCRIIS selection committee's recommendation to eliminate *Business B* from further consideration, made a

motion in Commissioners Court to that effect, and voted in favor of advancing *Business B* in the selection process in August 2004.

     c.    **Price** voted to select *Business B* as the finalist for the DCRIIS RFP and to begin contract negotiations with *Business B* in January 2005.

     d.    **Price** voted to advance *Business B* to the next phase of the Countywide Receipting System RFP – another Dallas County RFP that *Business B* pursued, estimated to be worth approximately $3.4 million – in January 2005.

     e.    **Price** voted to authorize the County Judge to sign a five-year agreement with *Business B*, worth approximately $3.2 million, for the DCRIIS project in March 2005.

     f.    **Price** voted to approve an amendment to *Business B*'s DCRIIS contract, providing for additional services related to the DCRIIS project at an added cost of approximately $238,000, in November 2007.

     65.    While **Price** publicly advocated for and sponsored *Business B* in the above-described manner, **Price**, **Nealy**, and **Campbell** conducted secret, concealed transactions to advance *Business B*'s interests and to unlawfully enrich themselves and others known to the Grand Jury, conduct they hid and attempted to hide from Dallas County, RFP selection committee members, the IT Steering Committee, members and employees of the Commissioners Court, competing vendors, and Dallas County citizens. These transactions included the following acts, among others:

a.      **Nealy** obtained the DCRIIS selection committee's internal memo to the Commissioners Court recommending eliminating *Business B* from the process, which was marked "**CONFIDENTIAL – Not for distribution**" and contained the committee's rationale for its recommendation, discussions about each vendor, the dollar amounts of each bid, and other confidential information.  At that time, *Business B*'s bid was the highest of the four competing vendors, but it ultimately submitted the lowest final offer.

b.      After **Price's** August 2004 success in keeping *Business B* in the DCRIIS RFP process, **Campbell** funneled $7,500 to **Nealy** by amending his contract with *Business B* for two months so that he would be paid an additional $5,000 each month on top of his original $5,000 compensation, which he then used to pay **Nealy**.  Upon depositing **Campbell's** $7,500 into her business account, **Nealy** immediately paid **Price** $2,500.

c.      **Nealy** and **Price** contacted each other multiple times about *Business B* during the no-contact period of the DCRIIS RFP process.

d.      **Nealy** obtained a second internal Dallas County memo marked "**Confidential – Not for Distribution**," issued by the DCRIIS selection committee to the Commissioners Court after each vendor submitted its BAFO.  Among other information, the memo contained the committee's scoring summary of the four finalists' bids and each of their BAFO pricing.

e.      During the time of the Countywide Receipting System RFP, **Price** faxed to **Nealy** an internal memo in March 2005 that the County's purchasing agent had provided

to the IT Steering Committee, relaying that the evaluation committee recommended not advancing *Business B* in the RFP process.  **Price's** fax also included the evaluation committee's scores of each competing vendor and the dollar figures of their bids.

      f.      **Price** contacted *Business B* to request that H.T. be promoted, after H.T. persuaded *Business B* to renew **Nealy's** contract in 2006 because of **Nealy's** close association with **Price** and her close ties with a partner of *Business L*.

      g.      **Price** accepted from **Nealy** the new 2005 BMW and the new 2007 Avalanche described in paragraphs 33 and 34 for his use and control, while **Nealy** made car payments totaling approximately $117,000 during the span of her *Business B* contracts.

      h.      **Nealy** spent approximately $170,000 on the four properties she bought for **Price**, described in paragraphs 33 and 34.

      i.      Throughout the span of **Nealy's** contracts with *Business B*, **Nealy** paid **Price** approximately $176,000 in over 60 separate financial transactions, many of which were checks from **Nealy** that **Price** deposited into his nominee account at City Bank or cashed in exchange for stacks of $100 bills, and checks that **Nealy** wrote to herself or to Dallas Telco and gave to **Price** to cash or deposit.  **Nealy's** stream of payments to **Price** included transactions during the DCRIIS selection period, such as, for example:

      (1)      The day after **Price** moved to advance *Business B* forward in the DCRIIS RFP process in May 2004, **Nealy** paid **Price** $3,500.

(2)     The day before **Nealy** was scheduled to meet with **Price** and

**Campbell** regarding *Business B* in June 2004, during the DCRIIS RFP no-contact

period, **Nealy** paid **Price** $2,000.

(3)     The day before **Price** voted to authorize the County Judge to sign the

approximately $3.2 million DCRIIS contract with *Business B* in March 2005,

**Nealy** paid **Price** $1,000.

### *Businesses V and U*

66.     *Business V* was an IT services company known to the Grand Jury that

conducted interstate business, including in the Dallas Division of the Northern District of

Texas.

67.     *Business U* was an IT services company known to the Grand Jury that

conducted interstate business, including in the Dallas Division of the Northern District of

Texas.

68.     During a period that included the years 2006 to 2010, *Business V* partnered

with various vendors, including *Business U*, that submitted bids for IT contracts in Dallas

County.  In or about early November 2006, *Business V* signed a consulting contract with

**Nealy** to "make introductions," "attend meetings," and "lobby on behalf of [*Business V*]"

in Dallas County and other local venues, in exchange for a $2,000 monthly fee and

commissions on new business generated.  **Nealy** lobbied on behalf of *Business V* under

yearly-renewed contracts until in or about January 2010.  She was paid approximately

$159,000 by *Business V* throughout that period.

69.     *Business V* utilized **Nealy** for access to and information from **Price** concerning several RFPs, including:

a.      the IT Help Desk Provider RFQ No. 2007-071-2776, issued by Dallas County in March 2007, for which *Business V* partnered as a subcontractor with *Business U* and for which a three-year contract worth at least $2 million was awarded to another vendor in September 2007;

b.      the County's Desktop Technical Support RFP No. 2007-117-3023, issued in July 2007, for which *Business V* also partnered as a subcontractor with *Business U* and for which a five-year contract worth approximately $8.5 million was awarded in late November 2007 to another vendor, *Business C* (a company known to the Grand Jury), over **Price's** objections; and

c.      the Inmate Phone System RFQ No. 2007-082-2822 to provide inmate phone services for the Dallas County jail facilities, issued in April 2007, for which a five-year contract, estimated to generate approximately $6 million in commissions for the County, was awarded in June 2008 to *Business U.*

70.     All three RFP/RFQs contained identical "no-contact" provisions in effect throughout the selection process, which stated:

> ***Upon release of the proposal, firms and their employees of related companies as well as paid or unpaid personnel acting on their behalf shall not contact or participate in any type of contact with County employees, including elected officials.  Such contact may result in the vendor being disqualified.  All contact must be coordinated through [the] Purchasing Supervisor, for this procurement.***

71.     Additionally, the RFP/RFQs mandated that, in accordance with State of Texas guidelines, to obtain the best value for the County through a negotiated procurement process, "[a]ll information will be kept confidential until a contract is formally executed or the [RFP/RFQ] is cancelled."

72.     **Price**, having accepted and agreed to accept the stream of financial benefits from **Nealy** described in paragraphs 33 and 34, took actions as specific opportunities arose that advanced *Business V*'s and *Business U*'s interests, including:

a.      **Price** voted in favor of advancing *Business U* and *Business C* as finalists in the Desktop Technical Support RFP in September 2007.

b.      **Price** voted "NO!" against authorizing contract negotiations with *Business C* (*Business U*'s competitor) as the selected vendor for the Desktop Technical Support RFP in November 2007.

c.      **Price** voted "NO!" against awarding the Desktop Technical Support RFP to *Business C* and against authorizing the County Judge to sign a contract with *Business C* in late November 2007.

d.      **Price** voted in favor of advancing *Business U* and three others in the Inmate Phone System RFQ process in July 2007.

e.      **Price** seconded a motion and voted in favor of selecting *Business U* as the vendor for the Inmate Phone System RFQ and entering into contract negotiations with *Business U* in March 2008.

f.      **Price** made a motion and voted to award the Inmate Phone System RFQ to *Business U* and to authorize the execution of a five-year contract estimated to generate approximately $6 million in commissions for the County in June 2008.

73.     While **Price** publicly advocated for and sponsored *Businesses V* and *U* in the above-described manner, **Price** and **Nealy** conducted secret, concealed transactions to advance *Business V*'s and *Business U*'s interests and to unlawfully enrich themselves and others known to the Grand Jury, conduct they hid and attempted to hide from Dallas County, RFP selection committee members, the IT Steering Committee, members and employees of the Commissioners Court, competing vendors, and Dallas County citizens. These transactions included the following acts, among others:

a.      During the no-contact period of the Desktop Technical Support RFP, **Price** forwarded to **Nealy** internal Dallas County emails from the County's purchasing agent and the County's chief information officer (CIO) discussing *Business U*'s bid for that RFP.

b.      Also during the no-contact period of the Desktop Technical Support RFP, **Nealy** obtained a confidential, internal Dallas County memo from the County's purchasing agent to the Commissioners Court in late October 2007 entitled, "Additional Information on Award Recommendation," that compared the BAFOs of *Business U* and *Business C*, the two finalists for the RFP, including pricing, negotiation points, and minority subcontractor participation for each business.

c.      The day after the date of the confidential memo, an executive with *Business U* emailed **Nealy** a letter from *Business U* to **Price**, responding point-by-point to the confidential, internal Award Recommendation memo that **Nealy** obtained.  **Price** had a staff member email *Business U*'s letter to the County's CIO.

d.      **Price** then forwarded to **Nealy** the County CIO's and County purchasing agent's confidential analysis of and response to *Business U*'s letter to **Price**.

e.      **Price** continued to leak confidential and internal information to **Nealy** during the no-contact period of the Desktop Technical Support RFP by forwarding to **Nealy** internal County emails from the County's purchasing agent with financial information about *Business C* that Price had requested in the Commissioners Court session the prior week.

f.      Two days before the final Commissioners Court vote on the Desktop Technical Support RFP, while the no-contact period was still in effect, **Price** leaked sensitive, inside information to **Nealy** about *Business C* by forwarding to **Nealy** an internal County email chain between the County's CIO and the County's purchasing director discussing potential negotiation points and revisions to the County's proposed contract with *Business C*.  In the email chain, a County employee noted that "[a]t Commissioner Price's request I have added him to the distribution of this response."  The email **Price** forwarded to **Nealy** also included a copy of the proposed contract with *Business C*.

g.     The next day, **Nealy** forwarded to *Business V* the confidential email chain that **Price** sent to **Nealy**, including the proposed Desktop Technical Support contract with *Business C*.

h.     During the no-contact period of the Inmate Phone System RFQ, **Price** agreed to meet with **Nealy** and representatives from *Business U* on multiple occasions, including during the period when the County was engaged in ongoing negotiations with *Business U* for that contract.

i.     **Price** continued to drive the 2005 BMW, the new 2007 Avalanche, and eventually the new 2010 Avalanche from **Nealy** described in paragraphs 33 and 34 for his use and control, while **Nealy** made car payments totaling approximately $92,000 during the span of her *Business V* contracts.

j.     **Nealy** spent approximately $83,000 on the four properties she bought for **Price**, described in paragraphs 33 and 34.

k.     Throughout the span of **Nealy's** contracts with *Business V*, **Nealy** paid **Price** approximately $122,000 in over 55 separate financial transactions, many of which were checks **Nealy** wrote to Dallas Telco that **Price** deposited or cashed in exchange for stacks of $100 bills.  **Nealy's** stream of payments to **Price** included transactions during the RFP/RFQ selection periods, such as, for example:

(1)     The week before **Price** voted to advance *Business U* to the next stage of the Desktop Technical Support RFP, **Nealy** paid **Price** $5,000.

(2)     In the month surrounding **Price's** leaks to **Nealy** of confidential

information regarding the Desktop Technical Support RFP vendor proposals and

contract negotiations, **Nealy** paid **Price** $5,500.

(3)     In the week following **Price's** vote to advance *Business U* to the

next stage of the Inmate Phone System RFQ, **Nealy** paid **Price** $2,500.

### *Business Q*

74.     *Business Q*  was an IT services company known to the Grand Jury that

conducted interstate business, including in the Dallas Division of the Northern District of

Texas.

75.     During a period that included the years 2001 to 2011, *Business Q* pursued

contracts with Dallas County related to, among other things, IT and desktop technical

support services.  In late August 2010, Dallas County issued Desktop Technical Support

Services RFP No. 2010-090-5232, seeking a vendor to provide technical expertise to

support over 5,500 Dallas County computer users.

76.     As with previous RFPs, the Desktop Technical Support RFP contained a

"no-contact" provision in effect throughout the selection process, which stated:

> ***Upon release of the proposal, firms and their employees of related companies as
> well as paid or unpaid personnel acting on their behalf shall not contact or
> participate in any type of contact with County employees, including elected
> officials.  Such contact may result in the vendor being disqualified.  All contact
> must be coordinated through [the] Purchasing Supervisor, for this procurement.***

77.     Additionally, the RFP mandated that, in accordance with State of Texas

guidelines, to obtain the best value for the County through a negotiated procurement

process, "[a]ll information will be kept confidential until a contract is formally executed or the RFP is cancelled."

78.    *Business Q* submitted a bid for the RFP in late September 2010. *Business C* submitted a competing bid that included **Nealy's** company, KNI, as a minority subcontractor to provide "staffing and management support" for the contract. **Nealy** was to receive approximately 30 percent of *Business C*'s proposed $5 million bid. During the bid evaluations, *Business C* was erroneously scored lower on its minority participation than the minimum necessary to move forward in the RFP process. Thus, in November 2010, *Business Q* and three other vendors advanced forward in the RFP process, but *Business C* and **Nealy**/KNI did not.

79.    Dallas County invited *Business Q* and the other remaining bidders to submit a BAFO for the RFP in December 2010. Soon after, during the no-contact period of the RFP, *Business Q* signed an eight-day contract retaining **Nealy** from December 29, 2010 until January 5, 2011 – the day after its BAFO was due – to "assist [*Business Q*] relating to the Dallas County Request for Proposals ('RFP') of Desktop Support Services." **Nealy's** $10,000 retainer was to be paid up front, and she billed *Business Q* on the first day of her contract period.

80.    In January 2011, *Business C* challenged its elimination from the RFP process based on minority scoring. After the County corrected the error, it permitted *Business C* to submit a late BAFO, which still included **Nealy** as a subcontractor and which edged in lower than *Business Q*'s revised bid. Consequently, the previously-

scheduled vote to select a vendor, set for January 25, 2011, was pulled from the Commissioners Court agenda and the selection process was delayed to permit an evaluation of *Business C*'s BAFO.  Ultimately, *Business Q* was awarded the contract on February 22, 2011.

81.    **Price**, having accepted and agreed to accept the stream of financial benefits from **Nealy** described in paragraphs 33 and 34, took actions as specific opportunities arose that advanced *Business Q*'s and *Business C*'s interests, including:

a.    **Price** made a motion and voted in favor of selecting *Business Q* as the preferred Desktop Technical Support vendor with whom to begin contract negotiations in February 2011.

b.    **Price** made a motion and voted in favor of approving the Desktop Technical Support contract between Dallas County and *Business Q* in February 2011. The agreement with *Business Q* was a three-year contract worth approximately $3.6 million, with the option of two one-year extensions.

82.    While **Price** publicly advocated for and sponsored *Business Q* in the above-described manner, **Price** and **Nealy** conducted secret, concealed transactions to advance *Business Q*'s and *Business C*'s interests and to unlawfully enrich themselves and others known to the Grand Jury, conduct they hid and attempted to hide from Dallas County, RFP selection committee members, the IT Steering Committee, members and employees of the Commissioners Court, competing vendors, and Dallas County citizens.  These transactions included the following acts, among others:

a.      During the no-contact period of the Desktop Technical Support RFP, and

before *Business C* submitted its joint BAFO with **Nealy**/KNI, **Price** leaked confidential

information to **Nealy** about the four finalists for the RFP by forwarding to **Nealy** an email

from the Commissioners Court's assistant administrator to the Commissioners that

contained the selection committee's evaluation scores, the four bidders' BAFO pricing,

minority subcontractor information, proposed transition times, and contract negotiation

requests.  Subsequently, *Business C*/KNI submitted one of the lowest offers.

b.      On the same day that a previously-proposed Commissioners Court order to

select *Business Q* as the Desktop Technical Support vendor was pulled from the Court's

January 25, 2011 agenda, **Nealy** deposited a $2,500 check from *Business C*.

c.      **Price** continued to drive the 2005 BMW and the new 2010 Avalanche, a

vehicle **Price** personally took delivery of from the dealership in the months leading up to

the issuance of the Desktop Technical Support RFP, while **Nealy** made car payments

totaling approximately $5,900 during the period of the Desktop Technical Support RFP

selection process.

d.      **Nealy** spent approximately $8,800 on the four properties she bought for

**Price**, described in paragraphs 33 and 34.

e.      During the period of the Desktop Technical Support RFP process, **Nealy**

paid **Price** approximately $9,525 in seven separate financial transactions.  **Nealy's** stream

of benefits to **Price** included transactions during the RFP selection period, such as, for

example:

(1)    In the month following *Business C* and KNI's RFP bid, **Nealy** paid **Price** $4,175.

(2)    Three days after *Business Q* submitted its BAFO for the Desktop Technical Support RFP, **Nealy** paid **Price** $2,100.

(3)    Upon receiving *Business Q*'s $10,000 check for her eight-day consulting contract, **Nealy** made a car payment on the 2010 Avalanche and paid the property taxes due for ***8 S. Lancaster Road and ***0 S. Lancaster Road.

### *Business H*

83.    *Business H*, a company known to the Grand Jury, conducted interstate and international business, including in the Dallas Division of the Northern District of Texas.

84.    In or about mid-2005, Dallas County's director of planning and zoning briefed the Commissioners Court about the possibility of obtaining Foreign Trade Zone status for properties located in Wilmer, Hutchins, Dallas, and Lancaster, Texas.

85.    At that time, FTZ status had been granted previously for certain property in Dallas County known as Foreign Trade Zone 39 or the Southport Foreign Trade Zone, which was within the City of Dallas near the intersection of Interstate Highway 20 and Interstate Highway 45.  Interested developers sought an expansion of FTZ 39 to include their own properties located in Wilmer, Hutchins, Dallas, and Lancaster.  Because of the number of properties in different cities, a single, comprehensive application was developed for these properties.  The application identified the particular land for which FTZ status was sought and was required to include consent letters from each potentially-

impacted local taxing authority – such as cities, counties, and school districts –

expressing concurrence for the FTZ designation regarding each property.

86.     The Dallas County Commissioners Court was one of the taxing authorities

whose consent by vote was necessary for the FTZ expansion.  Such an expansion

constituted business, a transaction, or series of transactions of Dallas County involving a

thing of value of $5,000 or more.

87.     After several developers separately approached the DFW Airport Board

(the Board) about obtaining FTZ status for specific properties, the Board contacted Dallas

County to suggest that the County lead an effort to develop an application for a

comprehensive zone that would include the various individual properties in these

multiple cities.

88.     **Price** agreed with the recommendation of the County's planning director in

March 2006 that the County should hold a public hearing during the Commissioners

Court's April 11, 2006 formal agenda to obtain input for the development of the

boundaries of a possible FTZ in the Lancaster-Wilmer-Hutchins-Southeastern Dallas area

and publish notice of the hearing in newspapers.  The Court held the hearing as planned.

By September 2006, a proposed application for several properties had been prepared for

briefing to the Commissioners Court for consent and set on the DFW Airport Board

agenda for approval.

89.     At that point, *Business H* decided to seek a late addition of its own property

in DeSoto, Texas to the then-completed application for FTZ designation.  *Business H,*

with **Nealy** already on retainer, paid **Nealy** until approximately March 2008 to lobby for such a result. **Price** assisted *Business H*'s efforts in several ways, including delaying for several months a Commissioners Court vote to grant consent for the existing application. In or about late February 2008, approximately a year and a half after the initial application was to be considered by the Commissioners Court, the FTZB approved FTZ status for all of the properties in Dallas, Wilmer, Hutchins, and Lancaster, and *Business H*'s property in DeSoto.

90.    **Price**, having accepted and agreed to accept the stream of financial benefits from **Nealy** described in paragraphs 33 and 34, took actions as specific opportunities arose that advanced *Business H*'s interests, including:

a.    After **Price** met with **Nealy** and *Business H* executives in November 2006, **Price** pulled from the Commissioners Court agenda an item recommending the endorsement of the FTZ application as it then existed without *Business H*'s property.

b.    Price met with an attorney representing the DFW Airport Board and asked what *Business H* needed to do to join the then-existing FTZ application as opposed to making its own separate application.

c.    **Price** continued to delay the Commissioners Court's discussion of the issue and the approval of the FTZ application until approximately May 2007, allowing *Business H* to try to obtain approvals from the appropriate taxing authorities for its own FTZ request.

d.      Some of the delay between October 2006 and May 2007 was due to *Business H*'s efforts to convince one or more Dallas City Council members to endorse *Business H*'s property as part of the FTZ application. **Price** told one Councilman that if the Councilman did not endorse the inclusion of *Business H*'s property in the existing FTZ application, **Price** would not approve any FTZ application.

e.      **Price** wrote letters to the Dallas Independent School District (DISD) and the City of Dallas vouching for *Business H* and urging their immediate support to include *Business H*'s DeSoto property in the pending Dallas, Wilmer, Hutchins, and Lancaster FTZ-expansion application.

f.      In May 2007, the Commissioners Court considered a briefing that proposed two separate applications for FTZ status: one for *Business H*'s property and the other for the Wilmer, Hutchins, Dallas, and Lancaster properties. **Price** voted "NO!" against approving the separate applications.

91.     While **Price** publicly advocated for and sponsored *Business H* in the above-described manner, **Price** and **Nealy** conducted secret, concealed transactions to advance *Business H*'s interests and to unlawfully enrich themselves and others known to the Grand Jury, conduct they hid and attempted to hide from Dallas County, members and employees of the Commissioners Court, applicants in the then-existing FTZ application for Dallas, Wilmer, Hutchins, and Lancaster properties, the DFW Airport Board, the FTZB, and Dallas County citizens. These transactions included the following acts, among others:

a.     **Price** continued to drive the 2005 BMW and the 2007 Avalanche described in paragraphs 33 and 34, while **Nealy** made car payments totaling approximately $42,000 during the period that **Price** advocated for *Business H* regarding its FTZ application.

b.     **Nealy** spent approximately $51,000 on the four properties she bought for **Price**, described in paragraphs 33 and 34.

c.     During the span of **Price's** and **Nealy's** assistance to *Business H* regarding the FTZ, **Nealy** paid **Price** approximately $73,000 in over 20 separate financial transactions, many of which were checks **Nealy** wrote to Dallas Telco that **Price** deposited or cashed in exchange for stacks of $100 bills.  **Nealy's** stream of payments to **Price** included the following examples:

(1)     Approximately two weeks after **Price's** conversation with the Dallas Councilman about approving *Business H*'s property in the FTZ application, **Nealy** paid **Price** $5,000.

(2)     The day after **Price** voted "NO!" against the two proposed separate applications for FTZ status with *Business H*'s property in its own application, **Nealy** paid **Price** $2,500, and she paid him another $2,500 two days later.

(3)     Within the week after **Price** wrote letters to the DISD and the City of Dallas urging their immediate support for including *Business H*'s DeSoto property in the pending application, **Nealy** paid **Price** $4,000.

## D.    CONCEALMENT OF THE CORRUPT AGREEMENT

92.    Because (i) the conspiracy was ongoing, (ii) further action was required by the Dallas County Commissioners Court concerning the matters sought by **Nealy's** and **Campbell's** clients, and (iii) **Price** was a high-level public official at the time the corrupt stream of payments and benefits were made, it was a necessary part of the agreement to conceal the illegal payments and benefits **Price** received.  **Price**, **Nealy**, and **Campbell** took steps to conceal the corrupt agreement, including the following, among others:

a.    **Price**, **Nealy**, and **Campbell** did not disclose **Price's** receipt of the illegal benefits from **Nealy** to Dallas County, members and employees of the Commissioners Court, Dallas County citizens, and others affected or influenced by **Price's** actions or inactions described above such as, for example, RFP selection committee members, the IT Steering Committee, competing vendors for various RFPs, applicants for FTZ status, the DFW Airport Board, and the FTZB.

b.    **Price** affirmatively concealed the illegal benefits he received from **Nealy** by filing Personal Financial Statements, signed under oath, with Dallas County for the reporting years 2001 through 2008 and 2010 that intentionally omitted the illegal payments, vehicles, and land purchases.

c.    **Nealy** created false books and records to conceal the quantity and dollar amount of payments she made to **Price**.

## Overt Acts

93.    In furtherance of the conspiracy and to effect its objects and purposes, at least one of the conspirators committed, and caused to be committed, one of the following overt acts, among others, in the Dallas Division of the Northern District of Texas, and elsewhere:

94.    The Grand Jury realleges and incorporates by reference the acts identified in paragraphs 31 to 92 as overt acts in furtherance of the conspiracy and to effect its objects and purposes.

95.    On numerous occasions during the calendar years 2001 through June 27, 2011, **Nealy** gave **Price** financial benefits totaling approximately $950,000.

96.    **Price** omitted all of the payments and other financial benefits from **Nealy** when he filed his state-law mandated  Personal Financial Statements for the calendar years 2002 through 2008 and 2010, which he signed under oath and filed with the Dallas County Clerk on or about May 28, 2002, April 30, 2003, February 11, 2004, May 5, 2005, May 1, 2006, April 30, 2007, June 26, 2008, April 30, 2009, and May 2, 2011.

97.    **Price** failed to file his state-law mandated 2009 Personal Financial Statement with the Dallas County Clerk between April 30, 2010, the due date of the Statement, and June 27, 2011.

98.    In mid-to-late December 2001, after *Business S* submitted a proposal for the IT Outsourcing RFP, **Nealy** promised to assist *Business S* in advancing forward in the RFP process.

99.     On or about January 2, 2002, **Nealy** paid **Price** $3,000 by causing a transfer of the funds from her KLNA account ****8994 at City Bank to **Price's** account ****7407 at City Bank.

100.    During the selection process for the IT Outsourcing RFP, on or about January 11, 2002, **Price** provided **Nealy** with written answers to *Business S*'s questions concerning the RFP, including inside information about the lowest bidder.

101.    On or about February 5, 2002, **Price** made a motion in Commissioners Court and voted in favor of advancing *Business S* forward in the IT Outsourcing RFP selection process, which allowed *Business S* to submit a presentation to the Commissioners Court and a BAFO for the contract.

102.    On or about March 20, 2002, **Nealy** helped facilitate the negotiation of the terms of a subcontractor agreement for *Business O* with *Business S* for the IT Outsourcing contract with Dallas County.

103.    On or about April 12, 2002, **Nealy** purchased for **Price** a parcel of real property located in Canton, Van Zandt County, Texas, for which she made a $28,819.63 payment at closing and financed the remaining $55,000 through City Bank in Forney, Texas, the same bank where **Price** maintained his nominee account.

104.    On or about April 30, 2002, **Price** made a motion in Commissioners Court and voted in favor of selecting *Business S* as the preferred IT Outsourcing Services vendor with whom to begin negotiations.

105.   On or about May 16, 2002, **Nealy** billed *Business S* $25,000 for "Consulting Services" and "Success Fee – Dallas County."

106.   On or about May 21, 2002, **Price** made a motion in Commissioners Court to approve the IT Services Master Agreement and fourteen Service Level Agreements between Dallas County and *Business S*.

107.   On or about May 21, 2002, **Nealy** paid **Price** $2,500 by transferring the funds from her KLNA account ****8994 at City Bank to **Price's** nominee account ****6372 at City Bank.

108.   On or about July 26, 2002, **Nealy** purchased a 2002 Chevrolet Avalanche that she provided to **Price** for his use.

109.   On or about October 2, 2002, the UGSA Tax Collection system was used to research the three Lancaster Road properties that **Nealy** later bought for **Price**. The results of this search were located in **Price's** possession on June 27, 2011.

110.   On or about October 22, 2002, **Campbell** emailed **Nealy** and others with *Business S* stating the importance of thoroughly briefing **Nealy** and **Price** in advance of an upcoming Commissioners Court session in which the Commissioners were set to "debate" on the County's contemplated integrated courts management system project.

111.   On or about October 23, 2002, **Price** paid an individual known to the Grand Jury $3,090 for the individual's work on **Price's** Canton property. **Price** paid the bill out of the City Bank account he maintained in the nominee name of family member WFP.

112. During the week of December 8, 2002, **Nealy** and **Price** met with a *Business S* sales manager, after which meeting the sales manager emailed **Nealy** to discuss *Business S*'s potential hiring of C.K.

113. On or about December 24, 2002, at approximately 9:29 a.m., **Nealy** withdrew $1,000 from her KLNA account ****8994 at City Bank, with "Cash (Price)" written in the memo line. Approximately 31 seconds later, $1,000 currency was deposited into **Price's** nominee City Bank account ****6372.

114. On or about January 9, 2003, **Price** signed a letter addressed "To Whom It May Concern" commending *Business S* as "the most responsive, forthright and credible in their approach" and that "[t]hey have proven to be a great partner and have aggressively met the many challenges that will face any organization during the transition period of this type of contract." Price elaborated:

> I have found their staff and the staff of their subcontractors to be of the highest caliber and they present an attitude of service first. I am looking forward to the remaining months and years of our relationship with [*Business S*] and I have full confidence that it will be a very successful experience.

115. On or about February 5, 2003, at approximately 11:30 a.m., $1,000 was withdrawn from **Nealy's** KLNA account ****8994 at City Bank. Approximately four minutes later, $1,000 in currency was deposited into **Price's** nominee account ****6372 at City Bank.

116. On or about February 12, 2003, **Nealy** scheduled a meeting with **Price** and *Business S* management.

117.   On or about March 3, 2003, **Price** faxed **Nealy** an internal Dallas County document that detailed the current status of the County's IT projects and needs, budget information, and recommendations about the County's potential courts management system project and others that *Business S* was pursuing during the span of its consulting contracts with **Nealy**.

118.   **Price** signed a letter to a *Business S* executive dated March 4, 2003, the day before **Nealy** was to meet with a *Business S* sales manager concerning renewing her contract, in which **Price** told the executive, "I am duty bound to remind you that some things have not changed." **Price** copied **Nealy** at the bottom of the letter via "cc" and had a member of his staff fax **Nealy** the letter.

119.   On or about March 5, 2003, **Nealy** paid **Price** $4,500 by split-depositing two checks made payable to her in the total amount of $9,400 by depositing $4,500 into **Price's** nominee City Bank account ****6372 and depositing the remaining $4,900 into her KLNA account ****8994.

120.   On or about March 27, 2003, **Nealy** signed a letter to the *Business S* sales manager referencing their previous discussions about her contract's March 31, 2003 expiration date, renewal options, and the fact that a "final definitive agreement has not been determined."

121.   On or about March 28, 2003, **Campbell** emailed **Nealy** and the owner of *Business Q* the contact information for another *Business S* executive whom *Business S*

had recently promoted to oversee company operations that included its contract in Dallas County. **Nealy** printed the email and handwrote "To: JWP" at the top of the page.

122.    On or about April 7, 2003, **Nealy** emailed the same *Business S* sales manager with whom she met in December 2002 to ask about the status of hiring C.K.

123.    On or about April 27, 2003, **Nealy** signed a personal financial statement in connection with her loan application to Lone Star Bank to purchase ***2 South Lancaster Road, showing $468,015 in annual income.

124.    On or about April 28, 2003, **Price** signed a second letter to *Business S*, addressed to the same executive for whom **Campbell** emailed **Nealy** the contact information on March 28, 2003. In this letter, **Price** stated:

> Based on recent discussions and information there may be some deviation on some of the promises made in the outset of this venture. This is a grave cause of concern and disappointment. Any variance from the original plan would be a breach, and unacceptable.

> Please ensure that all of the covenant and agreements that we have made in this regard are being honored.

125.    The day after **Price's** April 28, 2003 letter, **Nealy** obtained a new contract with *Business S* for a term retroactively starting April 1, 2003 and continuing through December 31, 2003. The contract provided **Nealy** with monthly compensation of $5,000, plus a $20,000 success fee if *Business S* was shortlisted as one of three IT outsourcing vendors for Parkland Hospital and a $35,000 success fee for other new contracts valued over $5 million in Dallas County and elsewhere.

126.   On or about April 28, 2003, **Nealy** paid **Price** $5,200 by transferring the funds from her KLNA account ****8994 at City Bank into **Price's** nominee City Bank account ****6372.

127.   On or about May 5, 2003, at approximately 9:32 a.m., **Nealy** received a Lone Star Bank loan commitment letter addressed to Nealy, advising her that it would loan her up to $70,000 to be used at the Sheriff's auction scheduled the next day for ***2 S. Lancaster Road.

128.   On or about May 5, 2003, at approximately 12:46 p.m., a CPA known to the Grand Jury prepared for **Price**, at **Price's** request, a 10-year $70,000 loan repayment schedule for ***2 S. Lancaster Road.

129.   On or about May 6, 2003, **Nealy** purchased ***2 S. Lancaster Road at the Sheriff's auction for $39,471.25.

130.   On or about May 19, 2003, **Campbell** emailed several *Business S* employees, including the executive to whom **Price** sent the April 28, 2003 letter, stating that **Price** "had concerns with" several issues, including **Nealy's** contract renewal and the hiring of C.K., both of which **Campbell** noted had been resolved.

131.   **Campbell** also relayed in the same May 19, 2003 email that **Price** further expected *Business S* to utilize a specific minority subcontractor, *Business Q*, not only in Dallas County, but also in Lee County, Florida.  **Campbell** noted that these issues were still unresolved.

132.    On or about May 22, 2003, **Price** acquired property insurance policy number SCP04070270 for ***2 Lancaster Road.

133.    On or about May 23, 2003, **Price** and/or **Nealy** submitted a sealed bid to the City of Dallas regarding the public sale of the foreclosed property located at ***0 S. Lancaster Road.  The sealed bid proposed a purchase price of $6,502.15 and included a down payment (including a $20 deed recording fee) of $1,020.

134.    On or about May 23, 2003, **Price** withdrew $1,020 from his Dallas Telco account.

135.    **Nealy's** bid of $6,502.15 for ***0 S. Lancaster was the highest bid and **Nealy** was notified of this on or about May 30, 2003.

136.    On or about June 2, 2003, **Nealy** was substituted for **Price** as the owner of ***2 S. Lancaster Road on insurance policy number SCP04070270.

137.    On or about June 17, 2003, **Price** seconded a motion in Commissioners Court and voted to approve *Business S* to perform an Oracle upgrade assessment for the County at a cost of approximately $200,000.

138.    On or about August 5, 2003, the City of Dallas notified **Nealy** that she still owed $5,502.15 on her bid related to ***0 S. Lancaster Road.  **Nealy** remitted a Cashier's Check for $5,502.15 to the City of Dallas and received the deed on or about August 22, 2003.

139.    On or about August 7, 2003, **Nealy** as applicant and **Price** as co-applicant signed an agreement for water and sewage services to be provided to the Canton property.

140.    On or about August 8, 2003, **Price** paid the initial fees for water and sewage services for the Canton property with a check from his nominee account at City Bank.

141.    On or about October 16, 2003, in preparation for a conference call scheduled the next day with *Business S* management to review **Nealy's** consulting contracts, **Campbell** emailed **Nealy** to give her a list of "current initiatives" that **Nealy** was "slated to be working."

142.    On or about November 17, 2003, **Nealy** had a will prepared in which she bequeathed to **Price** the properties located at ***2 S. Lancaster Road, Dallas, Texas; Canton, Texas; and ***0 S. Lancaster Road, Dallas, Texas.

143.    On or about December 16, 2003, **Price** seconded a motion and voted to pay *Business S* $21,125 for transition services and $3,932 monthly for equipment and monitoring support while *Business S* finalized its sale of its IT assets to *Business A* and negotiated with Dallas County to accept a change of control of the IT Outsourcing contract from *Business S* to *Business A*.

144.    On or about December 29, 2003, **Nealy** emailed a *Business S* sales manager, informing him that she had not received any information about extending her contract, due to expire on December 31, 2003.

145.    On or about December 30, 2003, **Nealy** paid **Price** $2,000 by check number 4924 issued from **Nealy's** KLNA account ****1364 at Bank of America.

146.    On or about February 10, 2004, **Nealy** signed a consulting agreement for $5,000 per month with *Business S*, effective January 1, 2004 through December 31, 2004, promising to "leverage established contacts at Dallas County to assure that the Client enjoys an excellent relationship throughout current contracts [sic] primary term."  She further agreed to assist in securing contracts for *Business S* regarding the County's contemplated Oracle upgrade project, records management contract, systems integration related to the planned Integrated Courts Management System, and the Juvenile Information System, for which **Nealy** would earn a percentage of the total value of any executed contract.

147.    On or about March 31, 2004, **Nealy** faxed to **Price** a letter from *Business A* to the County concerning several negotiation points related to terms under which *Business A* was willing to assume *Business S*'s IT Outsourcing contract.  On the fax cover sheet to **Price**, **Nealy** wrote, "Please call."

148.    On or about April 19, 2004, **Nealy** partnered with *Business B* in submitting a proposal for the DCRIIS RFP for which **Nealy** was to provide "an outreach and education program."

149.    After writing a $2,000 check to **Price's** campaign on April 21, 2004, **Campbell** billed *Business A* for the $2,000, listing the amount on his expense report as seminar/conference training.

150.    On or about May 25, 2004, **Price** made a motion and voted in favor of advancing *Business B* and three other vendors in the selection process for the DCRIIS RFP.

151.    **Nealy** paid **Price** $3,500 the next day.

152.    **Nealy** noted on her calendar a meeting set for June 14, 2004 regarding *Business B*, *Business C*, and *Business L*.

153.    On or about June 15, 2004, **Price** made a motion in Commissioners Court to accept the change of control from *Business S* to *Business A* and to amend the IT Outsourcing contract to reflect *Business A* as the vendor.

154.    On or about June 16, 2004, **Nealy** negotiated the terms of a possible $50,000 agreement with *Business B* to "sponsor a marketing program" for the DCRIIS RFP.

155.    **Campbell** billed *Business A* for "Client Entertainment & Meals" on June 17, 2004, listing **Nealy** and **Price** as the attendees.

156.    On or about June 28, 2004, **Nealy** paid **Price** $2,000 by check number 5150 issued from Nealy's KLNA account ****1364 at Bank of America.  The check was dated the day before a meeting scheduled on **Nealy's** calendar for June 29, 2004 with **Price** and **Campbell** regarding *Business B*.

157.    On or about July 17, 2004, **Campbell** paid **Nealy** $1,000 by check number 2512 issued from **Campbell's** personal account ****0526 at Bank of America.

158.   On or about July 19, 2004, **Nealy** paid **Price** $3,000 by check number 5151 issued from **Nealy's** KLNA account ****1364 at Bank of America.

159.   **Campbell** billed *Business A* for "Client Entertainment & Meals" on or about July 21, 2004, listing **Nealy** and **Price** as the attendees.

160.   Sometime prior to July 23, 2004, the exact date being unknown to the Grand Jury, **Nealy** unsuccessfully attempted to obtain a tax bidder's certificate from Dallas County so she could bid on ***8 S. Lancaster Road at a Sheriff's auction.  On or about August 2, 2004, since **Nealy** was unable to bid on the property, **Price** caused an individual known to the Grand Jury to bid $6,600 for it at the Sheriff's auction.

161.   On or about August 2, 2004, **Nealy** purchased official check number 251916067 from Lone Star Bank in the amount of $6,400.  This official check made payable to the Dallas County Sheriff was used by the known individual to acquire ***8 S. Lancaster Road property for Price.

162.   On or about August 2, 2004, **Campbell** paid **Kathy Nealy & Associates** $5,000 by check number 3206 issued from **Campbell's** personal account at Tinker Federal Credit Union.

163.   On or about August 3, 2004, a previously-scheduled order on the Commissioners Court agenda to approve the selection committee's two recommended vendors to move forward in the DCRIIS bidding process and exclude *Business B* was pulled from the court's agenda.

164.    On or about August 3, 2004, Price voted in favor of authorizing the County Judge to sign the novation agreement between *Business A* and Dallas County.

165.    **Campbell** billed *Business A* for a meal with **Nealy** and **Price** on or about August 9, 2004.

166.    On or about August 9, 2004, **Nealy** paid **Price** $3,500 by check number 5167 issued from **Nealy's** KLNA account ****1364 at Bank of America.

167.    On or about August 10, 2004, **Price** convinced other Commissioners to reject the DCRIIS selection committee's recommendation to eliminate *Business B* from the RFP process.  On **Price's** motion, the Commissioners Court voted to keep *Business B* in the selection process and move forward with three other vendors for the DCRIIS RFP.

168.    On or about that same day, **Campbell** submitted to *Business B* a $10,000 invoice dated August 10, 2004 for "Supplemental Consulting Services for Sales and Business Development."

169.    **Nealy** noted on her calendar a meeting set for August 13, 2004 between *Business B*, *Business C*, **Campbell**, and a partner with *Business L*.

170.    On or about August 17, 2004, City Bank of Forney requested that **Nealy** provide evidence that the 2003 real estate taxes for the Canton property had been paid. **Nealy** faxed the correspondence to **Price** with a note that **Nealy** provided the evidence to City Bank on or about August 23, 2004.

171.    On or about August 19, 2004, **Campbell** signed an amendment to his contract with *Business B*, increasing **Campbell's** monthly pay to $10,000 for the months of September and October 2004.

172.    On or about August 26, 2004, **Campbell** paid **Kathy Nealy & Associates** $7,500 by check number 1026 issued from **Campbell's** CCG account ****3066 at Bank of America, with "BP Invoice" written in the check's memo line.

173.    On or about August 27, 2004, **Nealy** paid **Price** $2,500 by check number 5196 issued from **Nealy's** KLNA account ****1364 at Bank of America.

174.    **Campbell** billed *Business A* for meals with **Nealy** and **Price** on September 2 and September 4, 2004.

175.    On or about September 15, 2004, **Nealy** handwrote on her calendar "Friday AM - Breakfast -Hyatt Hotel," as well as "up front - $10K  K" and "5K monthly," which related to a scheduled meeting for September 17, 2004 with **Campbell** and *Business B* managing director, H.T., at the Hyatt Regency.

176.    **Campbell** emailed **Nealy** on or about September 21, 2004, requesting that **Nealy** provide him with a $7,500 invoice for her efforts on the DCRIIS project for *Business B*.

177.    **Nealy** set a meeting on her calendar for October 18, 2004 with **Price**, a *Business A* vice president of sales (known to the Grand Jury), **Campbell**, and herself.

178.    On or about November 3, 2004, **Campbell** emailed **Nealy** a write-up of work she allegedly performed for *Business B* the preceding month.  **Nealy** copied

**Campbell's** write-up into an activity report for herself that she attached to her $4,000 invoice to *Business B* for "Consulting Services – October 2004."

179.   On or about November 4, 2004, **Campbell** signed a second amendment to his contract with *Business B*, reverting **Campbell's** salary back to $5,000 per month beginning November 6, 2004 until at least January 5, 2005.

180.   On or about November 23, 2004, **Nealy** purchased a new 2005 BMW that she provided to **Price** for his use.

181.   On or about December 6, 2004, **Campbell** emailed **Nealy** a write-up of work she allegedly performed for *Business B* the preceding month. **Nealy** copied **Campbell's** write-up into an activity report for herself that she attached to her $4,000 invoice to *Business B* for "Consulting Services –November 2004."

182.   On or about December 31, 2004, **Nealy** paid **Price** $4,000 by endorsing check number 5397 payable to Kathy L. Nealy, issued from **Nealy's** KLNA account ****1364 at Bank of America.

183.   On or about January 18, 2005, **Nealy** received and filed in her office a Dallas County memo marked "Confidential – Not for Distribution," dated January 18, 2005 and issued by the DCRIIS selection committee to the Commissioners Court concerning the committee's recommended vendor. Among other information, the memo contained the committee's scoring summary of the four finalists' bids and each of their BAFO pricing, including *Business B*.

184.    On or about that same day, January 18, 2005, **Nealy** paid **Price** $1,000 by check number 5424 issued from **Nealy's** KLNA account ****1364 at Bank of America.

185.    On or about January 25, 2005, **Price** voted in favor of approving *Business B* as the selected DCRIIS vendor and authorizing the County to begin contract negotiations with *Business B.*

186.    In the same Commissioners Court session on or about January 25, 2005, **Price** voted in favor of advancing *Business B* in association with *Business C* to the next phase of the RFP process for the Countywide Receipting System RFP.

187.    On or about February 1, 2005, **Nealy** billed *Business A* $9,237.02 for commissions on Dallas County projects such as the Oracle upgrade.

188.    On or about February 22, 2005, **Nealy** signed a "Government Affairs Consulting Agreement" with *Business B* in which **Nealy** promised to provide services related to "bid-winning methods" and "strategies concerning the Texas Metropolitan Local Government," among other things, in exchange for a $4,000 monthly fee.

189.    On or about March 9, 2005, during the Countywide Receipting System RFP, **Price** faxed to **Nealy** an internal memo that the County's purchasing agent had provided to the IT Steering Committee, relaying that the evaluation committee recommended not advancing *Business B* in the RFP process. **Price's** fax also included the evaluation committee's scores of each competing vendor and the dollar figures of their bids.

190.   On or about March 17, 2005, **Nealy** and/or **Price** directed the known individual who bid on \*\*\*8 S. Lancaster Road to issue a Quit Claim Deed to **Nealy**. **Price** served as the Notary Public for this real estate transaction.

191.   On or about March 28, 2005, **Nealy** paid **Price** $1,000 by check number 5497 issued from **Nealy's** KLNA account \*\*\*\*1364 at Bank of America.

192.   On or about March 29, 2005, **Price** voted in favor of having the County Judge execute a contract with *Business B* for the DCRIIS project.

193.   On or about April 26, 2005, **Price** met with **Nealy** and shared inside information concerning *Business A*.

194.   On or about July 26, 2005, **Nealy** signed a "Marketing Agreement" with *Business B* for payment not to exceed $50,000 to **Nealy**, in exchange for **Nealy's** promise to identify title companies to which *Business B* could market real property records imaged as part of its DCRIIS contract in Dallas County.

195.   On or about August 19, 2005, **Nealy** faxed to *Business A* a confidential, internal Dallas County memo dated August 12, 2005, addressed to the County's CIO, concerning *Business A*'s performance of its contract with Dallas County.

196.   On or about September 9, 2005, **Nealy** paid **Price** $1,000 by check number 5742 payable to Kathy L. Nealy, issued from **Nealy's** KLNA account \*\*\*\*1364 at Bank of America, with "Salary" written in the check's memo line.

197.   On or about January 5, 2006, **Nealy** faxed to **Campbell** an internal Dallas County document dated December 6, 2005 and entitled "IT Priorities," which relayed

information about current County IT projects, reorganization of the IT department, and

upcoming projects contemplated by the County, among other things.

198.    On or about January 8, 2006, **Nealy** signed another "Government Affairs

Consulting Contract" with *Business B* for the period of January 1, 2006 to December 31,

2006, providing her with a $4,000 monthly fee.

199.    On or about January 24, 2006, **Nealy** set an appointment on her calendar to

deliver a packet to **Price's** office concerning *Business B.*

200.    On or about January 27, 2006, **Nealy** paid **Price** $4,500 by check number

5999 issued from **Nealy's** KLNA account ****1364 at Bank of America.

201.    **Nealy** entered the notation, "[*Business A*] – Chris Campbell update" on her

calendar for February 13, 2006.

202.    **Nealy** set a meeting on her calendar for March 14, 2006 with **Campbell**

"re: Dallas County."

203.    On or about March 28, 2006, **Nealy** faxed to **Price** an email between

**Campbell** and *Business A* employees regarding "talking points" for a meeting with **Price**

that day.  On the fax cover sheet, **Nealy** handwrote a thank you note to **Price** for agreeing

to meet with *Business A.*

204.    On or about April 12, 2006, **Campbell** paid **Nealy** $1,000 by check number

2848 from **Campbell's** personal account at Bank of America.

205.    **Nealy** scheduled a meeting with **Price** regarding *Business A* for April 13,

2006.

206.   **Nealy** scheduled another meeting with **Price** for April 17, 2006, noting on her calendar, "[*Business A*] – JWP follow-up."

207.   On or about April 17, 2006, **Nealy** paid **Price** $4,500 by check number 6171 payable to Dallas Tel-Co, issued from **Nealy's** KLNA account ****1364 at Bank of America.

208.   On or about April 29, 2006, **Nealy** applied for GMAC Smart Buy financing for a 2007 Chevrolet Avalanche that she provided to **Price** for his use. **Nealy** made a down payment of $4,849.17 and financed the remainder at $669.05 per month for 48 months, with a $21,268 balloon payment due at the end of the term.

209.   On or about June 27, 2006, **Price** had a staff member fax and email to **Nealy** a letter from *Business A* to Dallas County summarizing a detailed IT discussion between the County's CIO, **Price**, another County commissioner, the County's administrator, and several *Business A* executives and managers on June 22, 2006.

210.   On or about June 30, 2006, **Price** agreed to meet with **Nealy** about her client, *Business H*, regarding Inland Port concerns.

211.   On or about July 12, 2006, **Campbell** paid **Nealy** $1,000 by check number 2942 issued from **Campbell's** personal account at Bank of America.

212.   On or about July 13, 2006, **Campbell** emailed **Nealy** requesting a meeting with **Price** related to a disputed issue involving *Business A* and the County.

213.   **Nealy** arranged a meeting with **Price**, **Campbell**, and *Business A* representatives for on or about July 18, 2006.

214.   On or about September 27, 2006, **Price** removed from an October 2006 Commissioners Court agenda an item concerning the approval of the then-existing FTZ application for Wilmer, Hutchins, Dallas, and Lancaster properties.

215.   On or about September 27, 2006, **Price** requested that the DFW Airport Board remove from its October 2006 agenda the then-existing FTZ expansion application for properties in Wilmer, Hutchins, Dallas, and Lancaster.

216.   On or about October 11, 2006, **Price** leaked a confidential, internal Dallas County document to **Nealy** via fax that discussed *Business A*'s personnel and salaries with respect to phasing out *Business A*'s Dallas County contract.

217.   On or about November 6, 2006, **Nealy** signed a one-year contract with *Business V* for "consulting services" beginning November 2, 2006, to "make introductions," "attend meetings," and "lobby on behalf of [*Business V*]" in Dallas County and other local venues, in exchange for a $2,000 monthly fee and 20% of the net hourly margin for new business generated.

218.   On or about November 13, 2006, **Price** faxed to **Nealy** an October 31, 2006 memo from the Dallas County Director of Planning & Development to the Commissioners Court recommending that the Court endorse the then-existing proposal to expand the FTZ in southern Dallas County.

219.   On or about November 13, 2006, after receiving the memo from **Price**, **Nealy** faxed it to a *Business H* executive.

220.    On or about November 14, 2006, **Price** contacted a senior level executive with *Business B* and requested that H.T. be made "MD [managing director] on the engagement" for the DCRIIS project.

221.    On or about November 14, 2006, **Nealy** scheduled a meeting with **Price** to update him regarding the possible inclusion of *Business H*'s property in the FTZ application.

222.    On or about November 14, 2006, **Nealy** forwarded to **Price** an email from *Business H* advocating inclusion of its DeSoto property in the then-existing FTZ application, despite any delay in the process that such inclusion might cause.

223.    On or about November 20, 2006, during a meeting with *Business H* executives, **Price** agreed to pull the FTZ application approval from the Commissioners Court agenda set for the following day.

224.    On or about November 21, 2006, **Price** met with an attorney representing the DFW Airport Board and asked about the process for adding landowners to then-existing FTZ application.

225.    On or about December 12, 2006, **Price** told a Dallas City Councilman that if the Councilman did not endorse the inclusion of *Business H*'s property in the FTZ application, Price would not approve any FTZ application.

226.    On or about December 27, 2006, **Nealy** paid **Price** $5,000 by endorsing a $5,000 commercial check from a business known to the Grand Jury, payable to KLNA,

which **Price** co-endorsed and deposited into his account ****1984 at Lakeside National Bank, withdrawing $3,000 in cash from such funds at the time of the deposit.

227.    On or about January 16, 2007, **Nealy** noted on her calendar "JWP- $."

228.    On or about January 17, 2007, **Nealy** set an appointment on her calendar with a *Business H* representative and **Price** to update **Price** concerning the FTZ.

229.    On or about January 24, 2007, **Price** requested that an individual representing the DFW Airport Board write a letter confirming the likelihood that FTZ status would be readily available for a property in **Price's** district that was not part of the current proposed FTZ expansion in southern Dallas County.

230.    On or about February 26, 2007, **Nealy** had a task on her calendar to schedule a meeting with **Price** concerning *Business V*.

231.    On or about February 26, 2007, **Nealy** had a task on her calendar to schedule a meeting with **Price** concerning *Business B* and the Dallas County Clerk.

232.    On or about March 26, 2007, **Nealy** paid **Price** $5,000 by check number 112 issued from **Nealy's** KLNA account ****2342 at Morgan Stanley.

233.    On or about April 9, 2007, **Nealy** emailed *Business H* to advise that Dallas County was still "on hold" regarding the FTZ application.

234.    **Nealy** made a note to schedule a meeting on her calendar with **Price** and the owner of *Business V* for April 12, 2007.

235.    On or about April 27, 2007, **Nealy** notified *Business H* that **Price** convinced at least two other members of the Commissioners Court to vote in favor of

including *Business H*'s DeSoto property in then-existing proposed FTZ application for properties in Dallas, Hutchins, Wilmer, and Lancaster, rather than proceeding forward with a separate FTZ application for *Business H*.

236.    On or about May 1, 2007, consistent with **Price's** advocacy for a single FTZ application that included *Business H*'s DeSoto property, **Price** voted "NO!" against two Commissioners Court orders that endorsed (1) a proposed expansion of the Southport FTZ with the Dallas, Hutchins, Wilmer, and Lancaster properties, and (2) a separate expansion of the Southport FTZ with *Business H*'s DeSoto property.

237.    **Price** signed a letter dated May 8, 2007 to the DISD Superintendent, vouching for *Business H* and urging DISD to "immediately support the addition of [*Business H*'s] DeSoto property to the Southport Foreign Trade Zone" application that included the Dallas, Lancaster, Wilmer, and Hutchins properties.

238.    **Price** also signed a letter dated May 8, 2007 to the Dallas City Manager, likewise vouching for *Business H* and urging the City of Dallas to "immediately support the addition of [*Business H*'s] DeSoto property to the Southport Foreign Trade Zone" application that included the Dallas, Lancaster, Wilmer, and Hutchins properties.

239.    On or about May 9, 2007, **Price** signed a letter to the DISD Board President, vouching for *Business H* and urging DISD to "immediately support the addition of [*Business H*'s] DeSoto property to the Southport Foreign Trade Zone" application that included the Dallas, Lancaster, Wilmer, and Hutchins properties.

240.    On or about May 15, 2007, **Nealy** handwrote "JWP -> Thanks!!" on an email directed to **Nealy** from a *Business H* executive that praised **Nealy's** efforts concerning the FTZ matter and stated, "whatever you are doing is certainly working for us," in that (1) DISD and the City of Dallas appeared likely to approve *Business H*'s inclusion in the Dallas, Wilmer, Hutchins, and Lancaster FTZ application, and (2) the DFW Airport Board decided to hold this application for a month to permit *Business H* to obtain such approval.

241.    On or about May 17, **Nealy** paid **Price** $4,000 by check number 9141 issued from **Nealy's** personal account ****3409 at Bank of America.

242.    On or about May 21, 2007, **Nealy** faxed to a *Business H* executive the letters **Price** had written to the DISD and the City of Dallas requesting immediate support for the addition of *Business H*'s DeSoto property to the then-existing FTZ expansion application.

243.    On or about July 23, 2007, **Nealy** faxed *Business V*'s owner an internal Dallas County memo from the County's purchasing supervisor to the Commissioners Court, dated July 24, 2007, recommending that *Business U* and three others advance in the Inmate Phone System RFQ process.

244.    On or about July 31, 2007, **Price** seconded a motion and voted in favor of advancing *Business U* and three others to advance in the RFQ process for the Inmate Phone System contract.

245.   On or about August 1, 2007, **Campbell** entered into a six-month agreement with *Business A* under which *Business A* paid **Campbell** a $5,000 monthly fee to serve as a sales executive.

246.   On or about September 10, 2007, a few days after *Business V*'s owner emailed **Nealy** for inside intelligence and help influencing the Desktop Support RFP on behalf of *Business U*, **Nealy** paid **Price** $5,000 by check number 122 payable to Dal - Telco, issued from **Nealy's** KLNA account ****2342 at Morgan Stanley.

247.   On or about September 18, 2007, **Price** voted in Commissioners Court to advance *Business U* to the next stage of the Desktop Technical Support RFP.

248.   On or about September 18, 2007, **Price** forwarded to **Nealy** an internal Dallas County memo discussing *Business B* and whether to exempt a proposed contract from the bidding process.

249.   On or about October 2, 2007, **Nealy** billed *Business V* $2,000 for "Consulting Services- Dallas County" during September 2007, listing "Served as liaison between client and Dallas County Commissioner John Wiley Price" as one of the services she provided.

250.   On or about October 29, 2007, **Price** forwarded to **Nealy** an email from the County's purchasing agent to **Price** expressing concerns about an issue that the agent felt had not been addressed by *Business U* regarding its bid for the Desktop Technical Support RFP.

251.    On or about October 30, 2007, **Nealy** received a confidential, internal

Dallas County memo to the Commissioners Court dated that same day entitled,

"Additional Information on Award Recommendation," in which the County's purchasing

agent compared *Business U*'s and *Business C*'s BAFOs, including pricing, negotiation

points, and minority subcontractor participation for the Desktop Technical Support RFP.

252.    On or about October 31, 2007, **Price** had a staff member forward an email

to the County's CIO that attached a letter from *Business U* to **Price**. In the letter,

*Business U* responded point-by-point to the confidential, internal Award

Recommendation memo that **Nealy** had filed among her records.

253.    On or about November 2, 2007, **Nealy** billed *Business V* $2,000 for

consulting services in October 2007, listing "Provided client with updates re: [*Business

U*] & Dallas County" as part of her services.

254.    On November 5, 2007, during the no-contact period of the Desktop

Technical Support RFP, **Price** leaked confidential information to **Nealy** about *Business C*

by forwarding to **Nealy** an internal Dallas County email from the County's purchasing

agent that contained financial information about *Business C* that **Price** had requested in

the Commissioners Court session one week prior.

255.    **Price** sent a second email to **Nealy** on or about November 5, 2007,

containing confidential information about the County CIO's and County purchasing

agent's analysis of and response to *Business U*'s October 31, 2007 letter to **Price**.

256.    On or about November 6, 2007, **Price** voted to approve and have the County Judge execute an amendment to *Business B*'s DCRIIS contract with Dallas County that provided for additional services by *Business B* and payment for such services.

257.    On or about November 6, 2007, **Price** voted "NO!" against authorizing contract negotiations with *Business C* as the selected vendor for the Desktop Technical Support RFP.

258.    On November 7, 2007, **Price** leaked confidential information to **Nealy** about *Business C* by forwarding to **Nealy** an internal Dallas County email discussing financial information of *Business C*, including its payroll, insurance costs, income and assets, and property tax payments.

259.    On or about November 15, 2007, **Nealy** paid **Price** $1,000 by check number 9226 issued from **Nealy's** personal account ****3409 at Bank of America.

260.    On or about November 16, 2007, **Nealy** paid **Price** $1,000 by check number 9227 issued from **Nealy's** personal account ****3409 at Bank of America

261.    On or about November 25, 2007, during the no-contact period of the Desktop Technical Support RFP, **Price** leaked sensitive, inside information to **Nealy** about *Business C* by forwarding to **Nealy** an internal County email chain between the County's CIO and the County's purchasing director in which they discussed potential negotiation points and revisions to the County's proposed contract with *Business C*.  In the email chain, a County employee noted that "[a]t Commissioner Price's request I have

added him to the distribution of this response." The email **Price** forwarded to **Nealy** also included a copy of the proposed contract with *Business C*.

262.  On or about November 26, 2007, **Nealy** forwarded to *Business V* the confidential email chain that **Price** sent to **Nealy** on November 25, 2007, including the proposed contract with *Business C*.

263.  On or about November 27, 2007, **Price** voted "NO!" against awarding the Desktop Technical Support RFP to *Business C* and against authorizing the County Judge to sign the contract with *Business C*.

264.  On or about December 28, 2007, **Nealy** paid **Price** $2,500 by check number 7234 payable to Dallas Telco, issued from **Nealy's** KLNA account ****1364 at Bank of America.

265.  On or about February 22, 2008, during the no-contact period of the Inmate Phone System RFQ, **Price** agreed to meet with representatives from *Business U* on March 5, 2008.

266.  On or about February 25, 2008, **Nealy** emailed a *Business H* executive, requesting information as to *Business H*'s property in the proposed FTZ expansion so that **Price** could update the citizens of DeSoto at a town hall meeting the following evening.

267.  On or about February 26, 2008, **Price** presented an update regarding *Business H*'s FTZ status at the DeSoto town hall meeting.

268.  On or about February 27, 2008, **Nealy** paid **Price** $2,500 by check number 131 issued from **Nealy's** KLNA account ****2342 at Morgan Stanley.

269.    On or about March 7, 2008, during the no-contact period of the Inmate Phone System RFQ, **Price** agreed to meet with *Business U* representatives and **Nealy** at lunchtime on March 13, 2008.

270.    On or about March 25, 2008, **Price** seconded a motion and voted in favor of selecting *Business U* as the vendor for the Inmate Phone System RFQ and entering into contract negotiations with *Business U*.

271.    While negotiations were ongoing with *Business U* for the Inmate Phone System contract and during the no-contact period, **Price** met with **Nealy** and an executive with *Business U* on or about March 31, 2008.

272.    On or about April 2, 2008, **Nealy** billed *Business V* $2,000 for March 2008 consulting services, identifying a meeting she attended with **Price** and *Business U* representatives as part of her services.

273.    On or about June 6, 2008, **Nealy** paid **Price** $1,000 by check number 7440 issued from **Nealy's** KLNA account ****1364 at Bank of America.

274.    On or about June 17, 2008, **Price** made a motion and voted in favor of awarding the Inmate Phone System contract to *Business U* and authorizing the County Judge to sign a five-year contract estimated to generate approximately $6 million in commissions for the County.

275.    On or about July 31, 2008, **Nealy** completed a consultant questionnaire for *Business U* in which she proposed to provide "business development consulting," to serve as a "liaison between" *Business U* and local municipalities, and to serve as an

"employee placement agency." In response to whether she or any member of her firm had "any relationship to a government agency or instrumentality, a political party or official thereof, or a candidate for political office," **Nealy** listed only a national political party, not **Price**.

276.   On or about August 6, 2008, **Nealy** received an email attaching a scope of work document from *Business U* that proposed monthly payments of $5,500 for a three-month period. *Business U* ultimately decided not to execute this document.

277.   On or about December 22, 2008, **Price** endorsed the back of a check issued by *Business T*, payable to John Wiley Price in the amount of $1,100, and cashed it on his Dallas Telco account ****1862, receiving eleven $100 bills.

278.   On or about August 2, 2009, **Nealy** paid **Price** $750 by check number 1071 payable to [K.M.], an individual associated with *Business M* and known to the Grand Jury. The check was issued from **Nealy's** Discover credit card account ****7391 and had "Artwork - Bal. due $750" written in the check's memo line.

279.   On or about May 10, 2010, **Price** took delivery of a 2010 Avalanche from a Chevrolet dealership in Dallas.

280.   On or about May 12, 2010, **Nealy** signed financing documents on the 2010 Avalanche that **Price** had picked up two days earlier. **Nealy** added the $1,005 turn-in fee for the 2007 Avalanche to the purchase price of the 2010 Avalanche, resulting in a total purchase price of $39,937.53, which she financed for 72 months at $687.85 per month.

281.    On or about August 2, 2010, **Nealy** signed a six-month contract with *Business L* to provide "advice to [*Business L*] concerning [*Business L*'s] present and potential clients," among other things, in exchange for a $7,500 monthly fee.

282.    On or about September 30, 2010, **Nealy** partnered with *Business C* to submit a bid for the Desktop Technical Support RFP No. 2010-090-5232, with **Nealy's** company, KNI, as a minority subcontractor. **Nealy's** anticipated piece of the bid was approximately 30 percent of *Business C*'s $5 million proposal.

283.    On or about November 8, 2010, **Campbell** billed *Business A* for a meeting with **Price** concerning a matter under the Commissioners Court's purview.

284.    On or about December 21, 2010, **Campbell** billed *Business A* for a meeting he attended with representatives of *Business L*.

285.    When KNI and *Business C* failed to move forward in the Desktop Technical Support RFP process, on or about December 29, 2010, **Nealy** signed an eight-day, $10,000 contract with *Business Q* to assist it with its BAFO due January 4, 2011.

286.    On or about January 3, 2011, after receiving *Business Q*'s $10,000 payment, **Nealy** paid (1) the Dallas County Tax Assessor/Collector for the property taxes on ***8 S. Lancaster Road and ***0 S. Lancaster Road from her KLNA account ****1364 at Bank of America, and (2) the car payment for the 2010 Avalanche.

287.    On or before January 4, 2011, **Nealy** advised *Business Q* as to the dollar range to target for *Business Q*'s BAFO.

288.   On or about January 7, 2011, **Nealy** paid **Price** $2,100 by check number 9649 issued from **Nealy's** personal account ****3409 at Bank of America.

289.   On or about January 11, 2011, **Price** signed a recommendation letter on behalf of *Business L* addressed to the chief procurement officer of the City of Atlanta, Georgia.  In the letter, **Price** noted that *Business L* had submitted a proposal for financial collection services to Atlanta, and he highly recommended *Business L* and its managing partner for such services.

290.   On or about January 15, 2011, during the no-contact period of the Desktop Technical Support RFP, and before *Business C* submitted its joint BAFO with **Nealy/KNI**, **Price** leaked confidential information to **Nealy** about the four finalists for the RFP by forwarding to **Nealy** an email from the Commissioners Court's assistant administrator to the Commissioners that contained the selection committee's evaluation scores, the four bidders' BAFO pricing, minority subcontractor information, proposed transition times, and contract negotiation requests.  Subsequently, *Business C/KNI* submitted one of the lowest BAFOs.

291.   On or about January 25, 2011, when a previously-proposed Commissioner Court order to select a Desktop Technical Support RFP vendor was pulled from the Court's agenda to permit an evaluation of *Business C*'s BAFO, **Nealy** deposited a $2,500 check from *Business C*.

292.    On or about February 8, 2011, **Price** made a motion and voted in favor of entering into contract negotiations with *Business Q* as the selected vendor for the Desktop Technical Support RFP.

293.    On or about February 22, 2011, **Price** made a motion and voted in favor of awarding the Desktop Technical Support RFP to *Business Q* and authorizing the County Judge to execute a three-year contract worth approximately $3.6 million, with the option of two one-year extensions.

294.    On or about April 22, 2011, **Nealy** paid **Price** $5,000 by endorsing check number 2552 payable to Kathy L. Nealy, issued from **Nealy's** KLNA "campaign" account ****3080 at Bank of America.

295.    On or about May 6, 2011, **Nealy** paid **Price** $1,000 by check number 9679 issued from **Nealy's** personal account ****3409 at Bank of America.

296.    On or about June 27, 2011, **Price** maintained approximately $229,500 in a safe in his residence.

All in violation of 18 U.S.C. § 371 (18 U.S.C. § 666(a)(1)(B) and (a)(2)).

## Counts Two through Seven
### Deprivation of Honest Services by Mail Fraud and Aiding and Abetting
### (Violation of 18 U.S.C. §§ 1341, 1346, and 2)

297.    The Grand Jury hereby adopts, realleges and incorporates by reference the allegations set forth in paragraphs one through twenty-three of this indictment as if fully set forth herein.

298.    At all times relevant to this indictment, Dallas County, Texas and its citizens had an intangible right to the honest services of their public officials.  As a public official for Dallas County, Texas, **John Wiley Price**, the defendant, owed a fiduciary duty to Dallas County and its citizens and was prohibited by state law from soliciting and accepting bribes as consideration for his decision, opinion, recommendation, vote, or other exercise of discretion as a public servant or for violating a duty imposed by law on him as a public servant, duties explained in paragraphs six and seven of the Introduction of this indictment.

## The Scheme

299.    Beginning in or about January 2001, the exact date being unknown to the Grand Jury, and continuing through on or about June 27, 2011, in the Dallas Division of the Northern District of Texas, defendants, **John Wiley Price** and **Kathy Louise Nealy**, aided and abetted by each other and by others known and unknown to the Grand Jury, engaged in mail fraud, that is, they devised a scheme and artifice to defraud and deprive Dallas County and its citizens of their right to the honest and faithful services of

Commissioner **John Wiley Price** through the solicitation and payment of bribes and the concealment of material information.

### Purpose of the Scheme

300.     The purpose of the scheme and artifice was for **Price** to secretly use his official position to enrich himself by soliciting and accepting payments and other things of value from **Nealy** in the form of a stream of financial benefits, as consideration for **Price's** action or inaction and influence with respect to contracts and other matters before the Dallas County Commissioners Court, as specific opportunities arose, and for **Nealy** to enrich herself by obtaining favorable action or inaction and influence for herself and her clients through corrupt means.

### Manner and Means

301.     The scheme and artifice was carried out in the following manner and means, among others: (a) **Price** solicited and accepted a stream of financial benefits in the form of payments and other things of value, including real estate and vehicles, from **Nealy** totaling more than $950,000; (b) **Price** provided favorable action or inaction and influence on behalf of **Nealy** and **Nealy's** clients as requested and as opportunities arose; and (c) **Price** and **Nealy** took steps to hide, conceal, and cover up this activity and the nature and scope of their dealings with one another.

302.     The manner and means of the defendants' scheme and artifice are more fully described in paragraphs 31 through 92 and 95 through 296 of this indictment, which are realleged and incorporated herein by reference.

### Execution of the Scheme

303.    For the purpose of executing and attempting to execute the above-described

scheme and artifice to defraud, defendants **Price** and **Nealy** knowingly caused matters

and things to be delivered by the United States Postal Service and by private and

commercial interstate carriers according to the directions thereon, on or about the dates in

each count below:

| Count | Date Mailed (on or about) | Contents |
|-------|---------------------------|----------|
| Two | October 2, 2009 | KLNA check number 8001 in the amount of $1,558.87 issued from **Nealy's** KLNA account ****1364 at Bank of America for a BMW monthly car payment |
| Three | November 23, 2009 | KLNA check number 8060 in the amount of $1,632.75 issued from **Nealy's** KLNA account ****1364 at Bank of America for a BMW monthly car payment |
| Four | July 1, 2010 | KLNA check number 8255 in the amount of $687.85 issued from **Nealy's** KLNA account ****1364 at Bank of America for a Chevrolet Avalanche monthly vehicle payment |
| Five | July 16, 2010 | KLNA check number 8274 in the amount of $687.85 issued from **Nealy's** KLNA account ****1364 at Bank of America for a Chevrolet Avalanche monthly vehicle payment |
| Six | November 1, 2010 | KLNA check number 8356 in the amount of $756.63 issued from **Nealy's** KLNA account ****1364 at Bank of America for a Chevrolet Avalanche monthly vehicle payment |
| Seven | December 10, 2010 | KLNA check number 8387 in the amount of $687.85 issued from **Nealy's** KLNA account ****1364 at Bank of America for a Chevrolet Avalanche monthly vehicle payment |

Each in violation of 18 U.S.C. §§ 1341, 1346, and 2.

**Count Eight**
**Conspiracy to Defraud the Internal Revenue Service**
**(Violation of 18 U.S.C. § 371)**

304.    The Grand Jury hereby adopts, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 303 of this indictment as if fully set forth herein.

305.    The Internal Revenue Service (IRS) is an agency of the United States Department of Treasury responsible for enforcing and administering the tax laws of the United States and collecting taxes owed to the Treasury of the United States.

306.    Defendants **John Wiley Price**, **Kathy Louise Nealy**, and **Dapheny Elaine Fain** were residents and citizens of the United States and resided in the Northern District of Texas during the time period set forth in this Indictment.

### The Conspiracy and Its Objects

307.    Beginning in or about October 2001, the exact date being unknown to the Grand Jury, and continuing through on or about June 27, 2011, in the Dallas Division of the Northern District of Texas, defendants, **John Wiley Price**, **Kathy Louise Nealy**, and **Dapheny Elaine Fain** did knowingly combine, conspire, confederate and agree with each other, and with others known and unknown to the Grand Jury, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue:  to wit, income taxes for the calendar tax years 2002 through 2009.

308.    It was further a purpose and object of the conspiracy to unlawfully conceal

and disguise approximately $1,150,000 in bribes and other taxable income that **Price**

received from several sources, including **Fain**, Male Man Sales d/b/a MMS, **Nealy**,

Kathy L. Nealy and Associates, KNI, Inc., *Business M*, and *Business T*.

### Manner and Means of the Conspiracy

309.    The conspirators used the following manner and means, among others, to

carry out the objectives of the conspiracy:

**A.    MALE MAN SALES (MMS)**

310.    Male Man Sales, d/b/a MMS Company (MMS), was an unincorporated

proprietorship with its principal office located in Dallas County, in the Northern District

of Texas. **Fain** filed an assumed name certificate for MMS in Dallas County in 2003,

identifying the business as a proprietorship. MMS originally sold novelty items and

clothing. In 2005, **Fain** renamed Male Man Sales the "MMS Company" at the request of

*Business X* (a company known to the Grand Jury) when Male Man began filling orders

for *Business X* and others for logo-stamped items, appliances, electronics, and other

goods.

311.    **Price** co-owned and/or operated MMS with **Fain** and had use of MMS

company credit cards. He received approximately $133,925 from MMS but reported

none of this income on his tax returns. **Price** and **Fain** concealed **Price's** receipt of this

income by several means, including: (1) **Fain** endorsed and diverted third-party checks

to **Price**; (2) **Price** or **Fain** split the deposits of the third-party checks between an MMS

account and one of **Price's** personal accounts; and (3) **Price** took cash back from deposits into MMS accounts.

## B. BRIBERY INCOME

312. As described in the Introduction and Counts 1 through 7 of this indictment, realleged and incorporated herein by reference, **Nealy** paid **Price** a stream of financial benefits totaling approximately $950,000 that included money, cars, and land. This stream of benefits from **Nealy** to **Price** also included more than $90,000 in rental income from *Business T*, a tenant located at one of the properties. **Price** reported none of this income on his tax returns.

313. **Nealy** and **Price** concealed **Nealy's** bribery payments in the same manner that **Price** and **Fain** hid **Price's** MMS income: (1) **Nealy** endorsed and diverted third-party checks to **Price**; (2) **Price** or **Nealy** split the deposits of third-party checks between **Nealy's** and **Price's** accounts; and (3) **Price** took cash back from deposits into **Nealy's** accounts. **Nealy** also wrote checks payable to **Price's** financial institutions and checks payable directly to **Price** on which she often wrote notations in the memo lines casting the check as something other than income to **Price**. Additionally, **Nealy** wrote checks payable to herself, endorsed them, and gave them to **Price**, which he deposited or cashed at various financial institutions, and **Nealy** transferred money from her accounts to **Price's** accounts.

C.    **LAND PURCHASES**

314.    **Nealy** and **Fain** helped **Price** conceal income, assets, and expenditures from the IRS by having parcels of real property titled in **Nealy's** and **Fain's** names. Specifically, as described in Count 1 of this indictment, realleged and incorporated herein by reference, **Nealy** paid for, and acted as the nominee owner of, four parcels of real property that actually belonged to **Price**. **Price** did not report on his tax returns any amounts that **Nealy** paid for the purchases, property taxes, and insurance for the four properties.

315.    **Fain** served as nominee purchaser and owner of three additional parcels of real property for **Price** to conceal and disguise his ownership and receipt of income.

D.    **PRICELESS COLLECTION AND *BUSINESS M***

316.    **Price** earned at least $50,000 from selling African art from his residence, at *Business T*, and at *Business M*, where he maintained inventory on a consignment basis, including art that he named and advertised as the "John Wiley Priceless Collection" or "Priceless Collection." **Price** reported none of this income on his tax returns.

317.    **Price** stored art pieces at MMS as well. He filed an assumed name certificate for Priceless Collections in Dallas County, Texas in January 2003, identifying the business as a proprietorship. He paid over $280,000 in cash and wrote at least five checks from his nominee account at City Bank to buy inventory. **Price** also used campaign funds to buy pieces that he sold through *Business M* and then deposited the income earned on those sales into his personal accounts.

## E.     BANKING PRACTICES

318.     To facilitate the covert transfers of money from **Nealy** and **Fain**, and to
conceal the substantial sums of income paid to **Price** by **Nealy**, **Fain**, MMS, and
additional sources, **Price**, **Nealy**, and **Fain** opened numerous bank accounts at the same
financial institutions.  Additionally, **Price** used his nominee account at City Bank to
negotiate payments from **Nealy**.  The financial institutions associated with the defendants
included, among others:

a.     City Bank in Forney, Texas

| **Price:** | **Nealy:** | **Fain:** |
|---|---|---|
| Account ****6372 (held in nominee name of family member) Account ****7407 Account ****8751 | Account ****4654 Account ****8994 | Account ****3231 |

b.     Lakeside National Bank in Rockwall, Texas

| **Price:** | **Fain:** |
|---|---|
| Account ****1984 Account ****2034 Account ****2042 Account ****2611 Account ****2985 | Account ****0007 (MMS) |

c.     Dallas Telco

| **Price:** | **Fain:** |
|---|---|
| Account ****1862 Account ****5172 | Account ****3476 Account ****9772 Account ****0235 (MMS) |

d.    Bank of America

**Price:**                    **Nealy:**                    **Fain:**

Account ****7956         Account ****1364         Account ****3413
                        Account ****0461         Account ****0343
                        Account ****2435         Account ****0356
                        Account ****3080         Account ****0955 (MMS)
                        Account ****3409         Account ****3400
                        Account ****6758
                        Account ****8122
                        Account ****9248

## F.    FALSE AND FRAUDULENT TAX RETURNS

319.    **Price**, **Nealy**, and **Fain** each presented false records to the same tax

preparer to use in preparing their tax returns for the calendar years 2002 through 2009.

These records omitted payments to **Price** or mischaracterized the payments to **Price** as

for legitimate purposes, such as "loans" or "reimbursement."

320.    **Fain** did not issue any Forms W-2 or Forms 1099 for income paid to **Price**

by MMS.

321.    **Nealy** did not issue Forms W-2 or Forms 1099 for income paid to **Price**,

except for a single false Form 1099 for the calendar year 2004 that underreported the

amount of money **Nealy** paid **Price** during that year.

322.    **Price** filed false income tax returns with the Internal Revenue Service for

the calendar years 2002 through 2009 from which he omitted bribes and other taxable

income that he received during those calendar years.

323.   **Price** filed false Personal Financial Statements for the years 2002 through 2008 and 2010, signed under oath, in which he omitted the above-described sources of income and ownership interests in certain parcels of real property.

### Overt Acts in Furtherance of the Conspiracy

324.   In furtherance of the conspiracy and to effect its objects and purposes, at least one of the conspirators committed, and caused to be committed, one of the following overt acts, among others, in the Dallas Division of the Northern District of Texas, and elsewhere:

325.   On July 5, 2002, **Fain** signed a document to give W.W. (an individual known to the Grand Jury) the authority to sell her purported one-half interest in property on Grady Niblo Road to **Price**.  The property was one of three that **Fain** agreed to purchase jointly with W.W. on **Price's** behalf as a straw purchaser in April 1999 under the business name of *JWP* (a business known to the Grand Jury).  The other two properties were located on Interstate 30 and Fairport Road (the specific locations of which, and of the Grady Niblo property, are known to the Grand Jury).

326.   On September 3, 2002, W.W. signed a warranty deed with a vendor's lien transferring all of his rights in the Grady Niblo property to **Price**.

327.   On September 3, 2002, **Fain** signed a quitclaim deed for the Grady Niblo property relinquishing any interest she had in the property to **Price**.

328.   On or about December 26, 2002, **Price** obtained two cashier's checks made payable to a title company in the total amount of $35,000 and gave them to **Fain**, who used them as a down payment for a home loan that closed on or about January 4, 2003.

329.   On or about April 15, 2003, **Price** filed his 2002 Income Tax return omitting bribes and other income, instead reporting a total income of $103,789 and claiming a refund of $8,776 from his fraudulent and false return.

330.   On or about April 30, 2003, **Price** filed his state-law mandated 2002 Personal Financial Statement with the Dallas County Clerk, signed under oath and omitting income sources and ownership interests in certain parcels of real property.

331.   On or about August 15, 2003, **Nealy** endorsed a cashier's check made payable to her for $2,000 from *Business T.*  In the endorsement, **Nealy** wrote "pay to order" of the nominee name for **Price's** account at City Bank.  This endorsed cashier's check was deposited into **Price's** nominee City Bank account ****6372 on or about August 15, 2003.

332.   On or about September 14, 2003, **Nealy** paid **Price** $1,678 by check number 4801 issued from **Nealy's** KLNA account ****1364 at Bank of America.  **Fain** deposited $1,000 from this check into **Price's** nominee City Bank account ****6372 on or about September 15, 2003 and took $678 cash back from the deposit.

333.   On or about February 11, 2004, **Price** filed his state-law mandated 2003 Personal Financial Statement with the Dallas County Clerk, signed under oath and omitting income sources and ownership interests in certain parcels of real property.

334.   On or about August 9, 2004, **Price** or **Fain** deposited into **Price's** nominee account ****6372 at City Bank **Nealy's** KLNA check number 5167 in the amount of $3,500, payable to **Kathy L. Nealy** and endorsed by **Nealy**.  **Fain** signed for $3,000 cash back from the proceeds.

335.   On or about October 18, 2004, **Price** filed his 2003 Income Tax return omitting bribes and other income, instead reporting a total income of $104,310 and claiming a refund of $8,683 from his fraudulent and false return.

336.   On or about January 31, 2005, **Fain** opened MMS account ****0007 at Lakeside National Bank, for which **Price** was the beneficiary and a convenience signer.

337.   On or about February 22, 2005, **Fain**, as a straw owner for **Price**, sold her interest in a parcel of real property on Fairport Road.  **Fain** received $17,495.92 from the real estate closing and immediately endorsed the check and gave it to **Price**.  **Price** then deposited the check into his Lakeside personal account ****2985.

338.   On or about February 28, 2005, *Business M* paid **Price** $7,500 in proceeds from the sale of African art.

339.   On or about March 28, 2005, **Price** endorsed the back of KLNA check number 5497 issued from **Nealy's** KLNA account ****1364 at Bank of America in the amount of $1,000, payable to Kathy L. Nealy with "salary" in the check's memo line, and deposited it into his WFP nominee account ****6372 at City Bank.

340.   On or about May 2, 2005, **Price** filed his state-law mandated 2004 Personal Financial Statement with the Dallas County Clerk, signed under oath and omitting income sources and ownership interests in certain parcels of real property.

341.   On or about August 16, 2005, **Price** filed his 2004 Income Tax return omitting bribes and other income, instead reporting a total income of $116,660 and claiming a refund of $13,360 from his fraudulent and false return.

342.   On or about January 25, 2006, **Price** deposited a *Business X* check in the amount of $57,031.51 made payable to MMS into MMS's Lakeside account number ****0007 and received $9,800 cash back.

343.   On or about March 24, 2006, **Price** split-deposited a *Business X* check in the amount of $23,128.24 made payable to MMS as follows:  $14,128.34 into MMS's Lakeside account number ****0007 and $3,000 into **Price's** personal Lakeside account number ****1984.  **Price** also received $6,000 in currency from the transaction.

344.   On or about April 17, 2006, *Business M* paid **Price** $2,465.33 in proceeds from the sale of African art.

345.   On or about May 1, 2006, **Price** filed his state-law mandated 2005 Personal Financial Statement with the Dallas County Clerk, signed under oath and omitting income sources and ownership interests in certain parcels of real property.

346.   On or about June 30, 2006, *Business T* paid **Price** $1,200 by check number 2043.

347.   On or about September 27, 2006, **Price** deposited a *Business X* check in the amount of $53,929.83 made payable to MMS into MMS's Lakeside account number ****0007 and received $9,500 cash back.

348.   On or about October 13, 2006, **Price** filed his 2005 Income Tax return omitting bribes and other income, instead reporting a total income of $112,015 and claiming a refund of $8,974 from his fraudulent and false return.

349.   On or about December 6, 2006, **Price** and/or **Fain** split-deposited a *Business X* check in the amount of $81,547.62 made payable to MMS as follows: $21,547.62 into MMS's Lakeside account number ****0007 and $60,000 into **Price's** personal Lakeside account number ****2985.

350.   On or about March 13, 2007, *Business M* paid **Price** $4,551.07 in proceeds from the sale of African art.

351.   On or about April 30, 2007, **Price** filed his state-law mandated 2006 Personal Financial Statement with the Dallas County Clerk, signed under oath and omitting income sources and ownership interests in certain parcels of real property.

352.   On or about May 14, 2007, **Nealy** wrote and signed KLNA check number 6879, payable to MMS in the amount of $4,563.44, issued from **Nealy's** KLNA account ****1364 at Bank of America, with "Inv.# 2093" written in the check's memo line.

353.   On or about May 18, 2007, **Price** deposited into his Lakeside National Bank account ****1984, **Nealy's** KLNA check number 6879 in the amount of $4,563.44, payable to MMS with "Inv.# 2093" written in the check's memo line.

354.    On or about July 2, 2007, **Price** split-deposited a *Business X* check in the amount of $35,737.34 made payable to MMS and a second check in the amount of $1,745.36 as follows:  $3,482.70 into MMS's Lakeside account number ****0007 and $25,000 into Price's personal Lakeside account number ****2985.  Price also received $9,000 in currency from the transaction.

355.    On or about October 15, 2007, **Price** filed his 2006 Income Tax return omitting bribes and other income, instead reporting a total income of $106,298 and claiming a refund of $8,936 from his fraudulent and false return.

356.    On or about January 2, 2008, **Price** paid an individual associated with *Business M* $2,320 out of his BOA Campaign account ****7956 for three pieces of African Art.  The next day, this same individual returned $2,185 to **Price** after deducting a commission of $45 on each piece of **Price's** African Art that was "sold" to **Price** by *Business M* the preceding day.

357.    On or about January 12, 2008, **Price** cashed *Business T*'s check number 2128 in the amount of $1,200 and received twelve $100 bills.

358.    On or about February 27, 2008, **Nealy** wrote KLNA check number 131 payable to Dal Telco in the amount of $2,500, issued from **Nealy's** account ****2342 at Morgan Stanley with "Repayment Loan" written in the check's memo line.  **Price** endorsed this check and cashed it on his Dallas Telco account ****1862, receiving 25 $100 bills.

359.   On or about June 26, 2008, **Price** filed his state-law mandated 2007 Personal Financial Statement with the Dallas County Clerk, signed under oath and omitting income sources and ownership interests in certain parcels of real property.

360.   On or about August 1, 2008, **Fain** applied for an American Express business account for MMS, with one of the credit cards issued in **Price's** name.

361.   On or about October 14, 2008, **Price** filed his 2007 Income Tax return omitting bribes and other income, instead reporting a total income of $104,770 and claiming a refund of $6,814 from his fraudulent and false return.

362.   On or about April 30, 2009, **Price** filed his state-law mandated 2008 Personal Financial Statement with the Dallas County Clerk, signed under oath and omitting income sources and ownership interests in certain parcels of real property.

363.   On or about May 1, 2009, **Price** endorsed the back of KLNA check number 7858 issued on **Nealy's** KLNA account ****1364 at Bank of America, payable to Dallas Telco in the amount of $3,000, and cashed it on his Dallas Telco account ****1862.  At the same time, **Price** also cashed a $1,260 check from *Business M* representing the proceeds of African art, and he received 42 $100 bills.

364.   On or about July 21, 2009, **Price** cashed *Business T*'s check number 2345 in the amount of $1,200.

365.   On or about August 5, 2009, **Nealy** wrote check number 1071 payable to [K.M.], an individual associated with *Business M.*  The check was issued from **Nealy's** Discover credit card account ****7391 in the amount of $750 and had "Artwork> Bal.

due $750"" written in the check's memo line.   **Price** cashed this check on his Dallas Telco account ****1862.

366.   On or about October 15, 2009, **Price** filed his 2008 Income Tax return omitting bribes and other income, instead reporting a total income of $109,124 and claiming a refund of $15,183 from his fraudulent and false return.

367.   On or about October 15, 2010, **Price** filed his 2009 Income Tax return omitting bribes and other income, instead reporting a total income of $109,758 and claiming a refund of $5,706 from his fraudulent and false return.

368.   On or about January 26, 2011, **Price** cashed *Business T*'s check number 2271 in the amount of $1,200 and received twelve $100 bills.

369.   On or about May 2, 2011, **Price** filed his state-law mandated 2010 Personal Financial Statement with the Dallas County Clerk, signed under oath and omitting income sources and ownership interests in certain parcels of real property.

370.   On or about June 27, 2011, **Price** maintained approximately $229,590 in a safe at his residence.

371.   The Grand Jury incorporates the following paragraphs of this indictment as overt acts of this conspiracy:  33, 34, and 95.

All in violation of 18 U.S.C. § 371.

<u>Counts Nine through Eleven</u>
**Subscribing to a False and Fraudulent U.S. Individual Income Tax Return**
**(Violation of 26 U.S.C. § 7206(1))**

372.    On or about the dates listed for each Count below, in the Dallas Division of the Northern District of Texas, defendant, **John Wiley Price**, a resident of Dallas, Texas, did willfully make and subscribe a United States Individual Income Tax Return, Form 1040, which was verified by a written declaration that it was made under the penalties of perjury and filed with the Internal Revenue Service, which said income tax return **Price** did not believe to be true and correct as to every material matter in that **Price** falsely reported his total income as the amounts in each of the calendar years set forth below, when in truth and in fact, as he then well knew and believed, he had received additional substantial income in each of the calendar years:

| Count | Tax Year | Offense Date | Falsely Reported Total Income | Falsified Document |
|-------|----------|--------------|-------------------------------|--------------------|
| Nine | 2007 | October 14, 2008 | $104,770 | U.S. Individual Income Tax Return, Form 1040 |
| Ten | 2008 | October 15, 2009 | $109,124 | U.S. Individual Income Tax Return, Form 1040 |
| Eleven | 2009 | October 15, 2010 | $109,758 | U.S. Individual Income Tax Return, Form 1040 |

Each in violation of 26 U.S.C. § 7206(1).

**Count Twelve**
**Attempt to Evade or Defeat Payment of Tax**
**(Violation of 26 U.S.C. § 7201)**

373.    On or about October 20, 2003 and continuing through on or about June 27,

2011, in the Dallas Division of the Northern District of Texas, defendant, **Kathy Louise**

**Nealy,** a resident of Dallas, Texas, did willfully attempt to evade and defeat the payment

of a substantial tax due and owing by her to the United States of America for the calendar

tax years 2002 through 2009, in the total amount of approximately $626,363, by

affirmatively concealing and attempting to conceal from the Internal Revenue Service the

nature, extent, and location of her assets and income through a pattern of conduct

including, but not limited to:

a.       conducting financial transactions at approximately ten different financial

institutions where she opened and used more than ten separate accounts;

b.       avoiding depositing multiple checks payable to herself and her businesses,

KLNA and KNI, into her own accounts;

c.       creating and maintaining inaccurate and/or imprecise business records,

accounting records, and bank records to obscure her sources and extent of income,

expenses, and debts;

d.       encumbering and reducing her monthly net cash flow and assets by

amassing debts and other unnecessary financial obligations, which she chose to pay

instead of paying the Internal Revenue Service;

e.      divesting herself of assets and income through the acquisition of luxury vehicles, an American Airlines Center suite, several parcels of real property, and other lavish expenditures;

f.      divesting herself of assets and income by paying hundreds of thousands of dollars to **Price** in the form of direct and indirect payments, vehicle payments, and related expenses in the bribery and mail fraud schemes alleged in Counts 1 through 7;

g.      divesting herself of assets and income through charitable giving and campaign contributions;

h.      filing false or fraudulent returns in some years; and

i.      signing a false and misleading real estate document in order to avoid federal tax liens.

All in violation of 26 U.S.C. § 7201.

## Count Thirteen
## False Statement
## (Violation of 18 U.S.C. § 1001)

374.   On or about June 27, 2011, in the Dallas Division of the Northern District of Texas, Defendant **Dapheny Elaine Fain** did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Department of Justice – Federal Bureau of Investigation (FBI), a department and agency of the United States, to wit, **Fain** made the following statements to Special Agents of the FBI:

a.     **Price** does not benefit from the business of MMS.

b.     **Price** has not transferred any of his money into an MMS account.

375.   When **Fain** made these statements, **Fain** well knew that these statements and representations were false, fictitious, and fraudulent.

All in violation of 18 U.S.C. § 1001.

### Forfeiture Notice
### (18 U.S.C. §§ 981(a)(1)(C), 26 U.S.C. § 853(p), and 28 U.S.C. § 2461(c))

1.     The allegations contained in the Introduction and Counts 1 through 7 of this Indictment are hereby realleged and incorporated as if fully set forth herein for the purpose of giving notice of forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     Upon conviction of an offense as set forth in Counts 1 through 7 of this Indictment and pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the defendants, **John Wiley Price**, **Kathy Louise Nealy,** and **Christian Lloyd Campbell** shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, including, but not limited to, a money judgment as a sum of approximately $950,000 in United States currency, representing the total amount of proceeds traceable to a violation of 18 U.S.C. §§ 666, 1341, or a conspiracy to commit any such offenses, for which the defendants are jointly and severally liable.

3.     If any of the forfeitable property described in the above paragraphs, as a result of any act or omission of a defendant, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property from that

defendant pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 26 U.S.C. § 853(p), and 28 U.S.C. § 2461(c).

A TRUE BILL

_Angela Brand_
FOREPERSON


SARAH R. SALDAÑA
UNITED STATES ATTORNEY

WALT M. JUNKER
Assistant United States Attorney
State Bar No. 24038115
1100 Commerce St., Suite 300
Dallas, Texas 75242-1699
Telephone: 214.659.8600
Facsimile: 214.659.8805
walt.junker@usdoj.gov


KATHERINE MILLER
Assistant United States Attorney
State Bar No. 00789107
1100 Commerce St., Suite 300
Dallas, Texas 75242-1699
Telephone: 214.659.8600
Facsimile: 214.659.8805
katherine.miller@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

JOHN WILEY PRICE (01)
a.k.a John Wiley Price III
KATHY LOUISE NEALY (02)
DAPHENY ELAINE FAIN (03)
CHRISTIAN LLOYD CAMPBELL (04)



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL 23 2014

CLERK, U.S. DISTRICT COURT
By _____
Deputy

## SEALED INDICTMENT

18 U.S.C. § 371 (18 U.S.C. § 666(a)(1)(B) and (a)(2))
Conspiracy to Commit Bribery Concerning a Local Government
Receiving Federal Benefits

18 U.S.C. §§ 1341, 1346, and 2
Deprivation of Honest Services by Mail Fraud and Aiding and Abetting

26 U.S.C. § 7206(1)
Subscribing to a False and Fraudulent U.S. Individual Income Tax Return

26 U.S.C. § 7201
Attempt to Evade or Defeat Payment of Tax

18 U.S.C. § 1001
False Statement

(13 COUNTS)

18 U.S.C. §§ 981(a)(1)(C), 26 U.S.C. § 853(p), and 28 U.S.C. § 2461(c)
Forfeiture Notice

A true bill rendered

---

DALLAS                                      FOREPERSON

Filed in open court this _23_ day of July, 2014.

--------------------------------------------------------------------------------

_____
                                                        Clerk

**Warrants to be Issued**

--------------------------------------------------------------------------------

UNITED STATES ~~DISTRICT~~/MAGISTRATE JUDGE
No Criminal matter pending, paralled asset forfeiture case 3:12-CV-893-D pending for
Defendant's 1 & 3