1

                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
2                            DALLAS DIVISION

3   UNITED STATES OF AMERICA,     )    **Case No. 3:14-cr-00293-M-1**
                                  )
4            Plaintiff,           )
                                  )    Dallas, Texas
5   v.                            )    September 15, 2014
                                  )    10:30 a.m.
6   JOHN WILEY PRICE,             )
                                  )    MOTION FOR APPOINTMENT
7            Defendant.           )    OF COUNSEL [30]
    _____)

8
                      TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE RENEE HARRIS TOLIVER,
                 UNITED STATES MAGISTRATE JUDGE.
10
    APPEARANCES:
11
    For the Government:          Walter M. Junker
12                               Katherine A. Miller
                                 UNITED STATES ATTORNEY'S OFFICE
13                               U.S. DEPARTMENT OF JUSTICE
                                 1100 Commerce Street, Third Floor
14                               Dallas, TX  75242-1699
                                 (214) 659-8600
15
    For the Defendant:          William M. Ravkind
16                               RAVKIND & ASSOCIATES, LLC
                                 5696 Murray Farm Drive
17                               Fairview, TX  75069
                                 (972) 649-6789
18
    Also Present:               Shirley Baccus-Lobel
19                               THE LAW OFFICES OF SHIRLEY BACCUS-
                                   LOBEL, P.C.
20                               8350 Meadow Road, Suite 186
                                 Dallas, Texas 75231
21                               (214) 220-8460

22  Court Recorder:             Jane W. Amerson
                                 UNITED STATES DISTRICT COURT
23                               1100 Commerce Street, Room 1611
                                 Dallas, TX  75242-1003
24                               (214) 753-2360

25

1    Transcription Service:          Kathy Rehling
                                     311 Paradise Cove
2                                    Shady Shores, TX  76208
                                     (940) 498-2402
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25           Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

1           DALLAS, TEXAS - SEPTEMBER 15, 2014 - 10:24 A.M.

2           THE COURT:  This is Case No. 3:14-cr-293-M, USA versus

3      Price.  And of course, we're here on the motion of Mr. Price

4      for appointment of CJA counsel.  I did, of course, get an

5      opportunity to review the motion, as well as the response and

6      as well as the reply.  And of course, the statute contemplates

7      -- actually, states that I shall make an inquiry into Mr.

8      Price's financial affidavit, which is the -- I mean, excuse me,

9      his financial circumstances, which is the point of today's

10     hearing.

11          Before we get started, in the reply, Mr. Ravkind, I noticed

12     your ire with the Government, but I did not note that you

13     contested anything that they have suggested, as far as Mr.

14     Price's financial ability, his finances, anything they've

15     suggested.  And so I wanted to give you that opportunity if

16     there was something more that you wanted to say or contest as

17     far as what they have suggested are additional or different

18     resources available to Mr. Price.

19          MR. RAVKIND:  Your Honor, the only thing -- is it all

20     right if I --

21          THE COURT:  Of course.

22          MR. RAVKIND:  The only thing that I could add, which

23     is probably in our motion, is that he has some assets.  His

24     problem is, he's totally illiquid.  And this case, I think the

25     Government will agree with me, is going to last a long time.

1   And Her Honor, who usually doesn't give us this kind of time,

2   has given us a year and a half --

3            THE COURT:  Right.

4            MR. RAVKIND:  -- to get ready.  So, I can't speak to

5   that issue.  And he doesn't have that kind of money.  He's got

6   some cars.  I don't know anybody who would take a car as a

7   legal fee.  I used to when I was younger, but not anymore.

8            THE COURT:  Has he made any inquiry, though, about

9   selling the residence that's not the one where he lives or

10  selling any of the car collection or liquidating any of those

11  illiquid assets?

12           MR. RAVKIND:  If he has, I am unaware of it.  And I

13  would think I would know.  His son lives in his house on -- I

14  think it's on Fifth Street.  The only reason I know about it, I

15  used to do the Turkey Trot and I used to jog by it, so I kind

16  of know where it is.

17      I think our motion speaks to what the problem -- it's not a

18  problem, it's just a fact.  It's a complicated case that the

19  Government itself spent months if not longer getting ready.

20  The district judge, Judge Lynn, commented at our one meeting

21  that she thought it was as complex a case she had ever seen.

22  And --

23           THE COURT:  Yes, sir, I know.  I was there with you.

24           MR. RAVKIND:  And she also commented that if there was

25  a case that required two lawyers -- I know that the Government

1   is not used to spending money on lawyers.

2          THE COURT:  The problem in your case is that, for the

3   two-lawyer situation to apply, the one-lawyer situation has to

4   first apply, which means that Mr. Price's resources have to be

5   such that he's entitled to a Criminal Justice Act attorney.

6   And at this point, I'm not seeing it.  I'm just going to be

7   honest with you.  And it has nothing to do with the

8   complication of the case so much as what appears to be the

9   assets that he has available to him that he's not yet expended

10  in pursuit of counsel.

11      And there are a couple of different things going on here,

12  because I know you mention in there about -- in your motion

13  about being able to hire experts.  Well, we're not at that

14  point yet.  And also, you know, we've had situations where a

15  person didn't qualify for CJA counsel but it didn't prevent

16  them from requesting and also being granted the opportunity to

17  share in the CJA discovery, which is available to you as well.

18      But at this point, there is no way I could even twist it,

19  based on all that I've seen here, to say that he cannot afford

20  to hire counsel.

21          MR. RAVKIND:  Your Honor, I don't know what counsel he

22  could hire.

23          THE COURT:  Well, he's hired you.

24          MR. RAVKIND:  But I've been representing him for

25  nothing for a long time.  I just can't afford to do it anymore.

 1          THE COURT:  I understand.

 2          MR. RAVKIND:  Otherwise, I would still hang in.  I

 3 seldom ask to be appointed.

 4          THE COURT:  I understand, but he's going to have to

 5 expend his resources first.  He's not going to be able to keep

 6 his resources and have the Government pay $175 an hour for him

 7 to have counsel.  It's not going to be your fee, anyway.  It's

 8 going to be what they pay CJA counsel, which is $175 an hour.

 9          MR. RAVKIND:  Right.

10          THE COURT:  And before he gets to that, I mean, even

11 in these cases that are complicated, even in the capital murder

12 cases, the Fifth Circuit is looking at limiting -- and I'm just

13 looking at the last one that I had with Judge Lynn -- looking

14 at limiting counsel to, you know, maybe $100,000 total in the

15 case.  And that's in a death penalty case.  And so right now

16 the Government is saying and you're not contesting that he's

17 got $60,000 of that in a fund that the law allows him to use to

18 hire counsel.  He's got automobiles that he's not driving that,

19 if he attempted to sell, he might be able to sell for that, and

20 he would have even more money than what we're envisioning the

21 Government would actually pay for him to have one attorney.

22          MR. RAVKIND:  Your Honor, respectfully, --

23          THE COURT:  Yes?

24          MR. RAVKIND:  -- as Your Honor is probably aware,

25 there's a forfeiture count in the indictment and there's a

1    forfeiture case that's already in court in front of Judge Lynn.

2            MS. LOBEL:  No.  Fitzwater.

3            MR. RAVKIND:  Excuse me.

4            MS. LOBEL:  Fitzwater.

5            MR. RAVKIND:  Judge Fitzwater.  Excuse me.  I've read

6    cases where there are forfeiture, and it seems I'm obligated to

7    tell you what I know bad, the only bad thing I know about was

8    he's totally illiquid.  I mean, the cars may be worth

9    something.  I don't know who -- I have no idea --

10           THE COURT:  Well, what about the campaign fund?

11           MR. RAVKIND:  Well, I don't --

12           THE COURT:  I mean, the campaign funds?

13           MR. RAVKIND:  Well, the campaign fund is only, what,

14    $15,000?

15        (Counsel confer.)

16           THE COURT:  Because that's one of the things you

17    didn't offer any opposition to so far, is the Government says

18    that there is about $60,000 that should be there based on his

19    reports of what he's reporting that he's taken in and spent in

20    campaign donations and expenditures.

21           MR. RAVKIND:  Well, I imagine he's got a campaign

22    coming up.  I don't know.  I've never taken campaign funds.

23           THE COURT:  Well, we can't be concerned about that at

24    this point.  I mean, we have to be concerned with what he has,

25    not, in the future, he's going to have a campaign.

1           MR. RAVKIND:  Well, I don't know how to address that.

2   $15,000.   Or if he had, I'm aware -- unaware that he has that

3   much money, but if he had $30,000 or $40,000, that might get us

4   to -- halfway to first base in this case.

5           THE COURT:  Okay.  Well, --

6           MR. RAVKIND:  And that's the problem.

7           THE COURT:  And so we're not talking about a situation

8   where he can never come back and say his circumstances changed.

9   But right now his circumstances, according to what I have

10   before me, are that he can afford to hire counsel.

11           MR. RAVKIND:  Your Honor, --

12           THE COURT:  At least at the rate the Government would

13   be reimbursing or paying someone to represent him.

14           MR. RAVKIND:  Respectfully, Your Honor, I don't think

15   he could get an attorney for what he's got in his campaign

16   fund.  No way.  The Government, as you know, has estimated

17   their case is going to take four months.  I've been with my

18   legal assistant.  We're trying to figure out, which we had to

19   figure out the schedule and a budget, which we're working on.

20   But we go past $15,000 so fast, respectfully, it makes your

21   head swim.  And Your Honor is, I'm sure, where the

22   investigation itself took multi-years, --

23           THE COURT:  I understand.  And you know I've already

24   found in one case that it's complicated enough, based on that

25   as one of the factors, that where the person couldn't hire an

1    attorney, two attorneys were warranted.  So I don't disagree

2    with you, but that's not the inquiry here.

3          MR. RAVKIND:  Is Your -- let me understand it.  Your

4    Honor is asking me whether or not I believe the evidence shows

5    that he has enough money to retain any qualified criminal

6    lawyer?

7          THE COURT:  No.  That's not my inquiry.  My inquiry is

8    whether or not he is financially unable to hire counsel.  Yes.

9          MR. RAVKIND:  For this case, I think there's no doubt

10   that he could not get -- hire counsel with the liquid and

11   illiquid assets that he's got.

12         THE COURT:  Okay.  There is no way I can find that he

13   can't with the liquid and illiquid assets he has now.  He can't

14   have those and get me to appoint an attorney for him.  He can't

15   have that money sitting here or potentially sitting here and

16   say he doesn't -- he can't hire an attorney.  There are no

17   attempts that I know of.  You know, treating Mr. Price just

18   like everyone else, --

19         MR. RAVKIND:  I agree.

20         THE COURT:  -- there are no attempts that I know of

21   that he's attempted to retain counsel and been unable to.

22   There are no attempts that I know of, and I've asked about that

23   this morning, for him to actually make -- determine or make

24   some attempt to liquidate his illiquid assets.  There is not

25   even an acknowledgment of how much he does have in cash

1  available.

2       So, I mean, what do I do with that?  I have to treat him

3  just like I treat everyone else, and there is no one else who

4  could come in here with those kind of assets and I could find

5  that they couldn't afford their own attorney.

6            MR. RAVKIND:  Your Honor, respectfully, you know, I've

7  already started -- we've -- I've started working on discovery

8  because, although we have a year and change to get ready, it'll

9  take that.  I don't know how many, the documents, I can't count

10  that high, how many there are.  I don't have that long.  And a

11  lawyer who got involved now I don't think would get involved --

12  obligate himself to -- I don't -- once you're involved, you're

13  involved.  You know, you'd have to go back to court to get out.

14  You just -- just when you find out there's not enough money.

15  And there's not enough money to do the discovery.

16            THE COURT:  Well, now --

17            MR. RAVKIND:  I can -- I know that from a --

18            THE COURT:  As I've mentioned to you previously,

19  that's a separate issue.  Nothing about this precludes you from

20  requesting to share in the discovery that will be available to

21  the CJA attorneys.  And it happens.

22            MR. RAVKIND:  Your Honor, I'm just, again,

23  respectfully, I'm of the opinion that the lawyer who tries the

24  case ought to prepare it.  I know it doesn't happen all the

25  time, but generally, criminal defendants lose, and they lose

```
 1   for a lot of reasons.  That's one of them.

 2          THE COURT:  Well, I think we're talking about two

 3   different things, though.

 4          MR. RAVKIND:  I'm not trying to.

 5          THE COURT:  Sounds like it, though.

 6          MR. RAVKIND:  What I'm trying to say is that I'm aware

 7   of the -- what liquid assets are available.  At least, I've

 8   been told what they are.  I have not gone out and had an

 9   investigator go check them out.  And that's not enough money to

10   get somebody to commit themselves to get involved in this case

11   and stay to the end.  There's just not -- no one will do it.

12          THE COURT:  Okay.  Well, Mr. Ravkind, I can almost

13   guarantee you that the Government would not pay you if you were

14   appointed as much as the liquid and illiquid assets of Mr.

15   Price are worth.  CJA counsel is just not compensated that way.

16          MR. RAVKIND:  And I don't think I'm really asking for

17   that.

18          THE COURT:  Then I don't understand your request.

19          MR. RAVKIND:  I'm saying that my experience with Mr.

20   Price, because I've known him a long time, I've represented him

21   a lot of times, a number of times, so I'm familiar --

22          THE COURT:  I know.

23          MR. RAVKIND:  -- with what he's got.

24          THE COURT:  Uh-huh.

25          MR. RAVKIND:  And if he has -- I'll just take a figure
```

1  out of the air -- if he's got $50,000 total, I don't know what

2  you could sell those cars for.  I have no idea.  Every time I

3  get involved in a case where we're selling assets, it doesn't

4  work.  All of a sudden all the friends are gone.  People who

5  will buy it are looking for bargains.  You can't do it.  And

6  our problem is we need to be getting ready now, right this

7  second.  But I can tell John to go out and try to sell his

8  cars.  That's not going to get us anywhere.  Those cars are not

9  going to sell for much.  They're restored cars that he

10  restored, and so I don't know exactly -- I've asked Shirley to

11  be involved.  She has refused to get involved until we get

12  court-appointed, because I don't think --

13           THE COURT:  She wants to get paid.

14           MR. RAVKIND:  Well, let's put it this way.  She don't

15  want to be running up hours and we're not court-appointed.

16  What I'm hearing right now, though, we haven't given you enough

17  information to be court-appointed.

18           THE COURT:  Well, the information that I have says to

19  me you don't qualify for court-appointed counsel.  That's what

20  the information that I have before me now says.

21           MR. RAVKIND:  I don't know what -- how much -- see,

22  I'm kind of talking a little to myself, but I don't know how

23  much you think he's got.

24           THE COURT:  Well, I think that the Government made a

25  good point about several of his assets, and you've not

1   contested that.  In addition to that, on his financial

2   affidavit, he says that he earns $6,500 approximately a month.

3   Just from looking at the news, I know that Commissioners earn

4   more than that a month.  You know, I know that he has real

5   estate, even if it's -- even if his -- and he has real

6   property, even if his son is living in it.  You know, that's

7   the kind of thing that I can't take into consideration, making

8   sure his son has a place to live.  If he's got that asset and

9   he can liquidate it, then he needs to liquidate it.  Or find

10  some other way to use whatever equity he has in it toward his

11  representation.

12      So, to me, it's not what you haven't presented; it's what's

13  there and there's no contest about, there is no argument about.

14          MR. RAVKIND:  Well, respectfully, Your Honor, we have

15  more discovery than I've ever seen in any case ever, and I've

16  been in an awful lot of cases.  And I don't know any way to get

17  in and say, well, I'll get involved and hope that maybe he'll

18  hit a home run on selling assets, because I don't think he

19  will.  I just --

20          THE COURT:  Or respectfully, Mr. Ravkind, maybe you

21  shouldn't take that on, then.  I mean, --

22          MR. RAVKIND:  Maybe.

23          THE COURT:  -- maybe.  Maybe that's the solution, that

24  you not take it on because you're not able to make that

25  commitment to him.  And maybe that's a frank talk you should

1  have with him about it, as opposed to having the taxpayers pick
2  up his bill.  You know:  Either you're going to use this and
3  you're going to liquidate these assets to pay me or someone
4  else, or you're going to be in trouble.
5         MR. RAVKIND:  Well, I wouldn't have any problem making
6  a deal with the Government that if we're able to liquidate
7  these assets for anywhere near that it would take to try this
8  case, I'll just give the money to the Government.  I've seen
9  that happen.
10        THE COURT:  Well, you know, what we do routinely is,
11 when someone's on the line and they can contribute something,
12 we order them to pay towards the cost of their attorney.  I
13 don't think Mr. Price is on the line, with what I see here.  I
14 believe that he has funds that he could hire his own attorney.
15 And you're not presenting evidence to me different than that,
16 although you're -- I understand your argument.
17        MR. RAVKIND:  Well, I don't know if -- respectfully, I
18 think it's evidence, because I'm saying as a lawyer, and I
19 think Ms. Lobel would say the same thing, you can ask her, but
20 what he has and what we think he could reasonably raise, if he
21 could raise anything, would not -- is not enough to try this
22 case and to get ready for it.  Getting ready for it is probably
23 more expensive than trying it.  You don't know that until you
24 get involved in it, but I would hate to be the lawyer who tried
25 a case and had not reviewed all of the discovery.  And just the

 1  time it would take to review the discovery is unbelievable.

 2          THE COURT:  I understand.  And Ms. Lobel knows,

 3  because we've had a case together with a discovery issue where

 4  she's actually gotten to the point where she wasn't getting

 5  paid anymore.  But the way it started out was her client was

 6  able to afford his own -- I can't remember if it was a him or

 7  not -- his own attorney, you know, and that's where we are now.

 8  We're not looking at, you know, what his situation is down the

 9  road, but right now what he has are assets that don't make him

10  indigent under any measure.

11          MR. RAVKIND:  Well, then what you're telling, under

12  any measure, he's not going to be able to get a lawyer to get

13  ready for the case.

14          THE COURT:  Okay.

15          MR. RAVKIND:  Because no lawyer --

16          THE COURT:  Well, it would be my suggestion, though,

17  that he at least be able to come back and tell -- and represent

18  to the Court that he's made those inquiries --

19          MR. RAVKIND:  Yes.

20          THE COURT:  -- and show me some proof of that, that

21  with the assets he has now, looking at what the Government said

22  there is, liquid and illiquid, and what you know and you've --

23  and he's mentioned in his financial affidavit there is, that he

24  could not find anyone who would be willing to take him on for

25  that.

1      So, I can -- I mean, so basically I guess I will deny it,

2   then, without prejudice to if in the future there is some

3   additional evidence along those lines you want to present.  I

4   mean, you know, there's just --

5          MR. RAVKIND:  Well, the assets are -- he's listed his

6   assets, as far as I know.

7          THE COURT:  Well, they're so different than what was

8   in the Government's response.

9          MR. RAVKIND:  Well, the Government gave a rather

10   generous view of what used cars sell for.

11          THE COURT:  Well, but the Government starts with

12   $60,000 in a campaign account which under Texas law he can use

13   in this case because some of the charges relate to his

14   employment, relate to his position.

15          MR. RAVKIND:  Your Honor, I think -- I've been around

16   long enough to know when I'm losing an argument.

17          THE COURT:  I don't -- I'm just trying to make sure

18   that I'm handling this the way I would handle any other case.

19   That's all.

20          MR. RAVKIND:  And I don't think --

21          THE COURT:  I'm not trying to argue with you.

22          MR. RAVKIND:  I don't think if the Lord himself walked

23   in here he could get a lawyer to handle the discovery and the

24   trial of this case for anywhere $60,000.  Not even --

25          THE COURT:  But that's not all.  That's where it

1    starts, but that's not all.  And I can't imagine that he can't

2    find a lawyer who wouldn't take that as a retainer, knowing

3    that he has other assets from which he can raise money to pay,

4    including a rather generous salary.

5        And as I said, that doesn't preclude him from applying to

6    share in the discovery, which you know there is going to be a

7    group discovery of all those terabytes of information.  It

8    happens all the time.  It doesn't prevent him from, if his

9    circumstances are different and he's actually found out he

10   can't sell any of those assets, coming back and showing the

11   Court at that point the efforts, proof of the efforts he's made

12   to do so and been unsuccessful.

13              MR. RAVKIND:  Your Honor, I --

14              THE COURT:  But at this point, --

15              MR. RAVKIND:  Your Honor, there's a forfeiture count.

16   There's a forfeiture case and a forfeiture count.

17              THE COURT:  But it didn't include those assets that

18   were listed.  Maybe I'm wrong about that.  Let me hear --

19              MR. RAVKIND:  Well, the indictment --

20              THE COURT:  Let me hear from you, Mr. Junker.

21              MR. JUNKER:  Your Honor, the forfeiture count does not

22   -- the forfeiture count in the indictment is for a money

23   judgment.  So that would be something he would be concerned

24   about at the end of the case, not right now.  It's not being

25   used to --

1            THE COURT:  Have any of those assets you listed that

2  are illiquid been seized or is there some lien on them?

3            MR. JUNKER:  No, Your Honor.

4            THE COURT:  Okay.

5            MR. JUNKER:  The asset forfeiture civil case is

6  separate and apart.  That involves money that was found in

7  Commissioner Price's safe as well as money from a land sale.

8  And that's in a separate case before Judge Fitzwater.  Those

9  proceedings have been stayed, and that's the status of that.

10           THE COURT:  But that's been seized, so that's not

11 something he can use.

12           MR. JUNKER:  Those have been seized, yes.

13           THE COURT:  That's what I'm trying to figure out.

14           MR.  JUNKER:  That is correct, Your Honor.  Yes.

15     And Your Honor, just because, again, we're taking no

16 position on this one way or the other, we're just presenting

17 the Court with additional facts, I want to make certain that

18 the Court knows that the estimate that I arrived at for the

19 $60,000 for Commissioner Price's campaign funds, he's required

20 to report, as I understand it, every six months.  So there is a

21 time lag there as far as what the exact current amount is in

22 that campaign account.  We can't tell you other than what we've

23 -- you know, the process that I outlined in the response to the

24 Court.  That's something you would have to ask Commissioner

25 Price.

 1          MR. RAVKIND:  Your Honor, what it sounded like is that

 2   he's not going to -- we're getting the discovery now.  Our --

 3   my office has got so much stuff in there I can't even -- I

 4   don't know whether -- I've never seen that much before in my

 5   life.  I think most of it is going to turn out -- I've been

 6   doing this too long not to know it -- is going to be

 7   irrelevant.  But I don't know that.  Because I think the lawyer

 8   who doesn't do total discovery, even though you think that it's

 9   excessive, is just looking for a writ.  He might as well just

10   file it himself, because if he loses, that's what's going to

11   happen.  And --

12        Shirley, have you got anything to add?

13          MS. LOBEL:  Well, I've not entered an appearance as

14   counsel.  I don't know if you want to hear from me or not,

15   Judge Toliver.  I'd be happy to speak, but I --

16          THE COURT:  It --

17          MS. LOBEL:  I have not entered an appearance.

18          THE COURT:  I understand that.

19          MS. LOBEL:  Yes.

20          THE COURT:  And with that proviso, if you'd like to

21   add something, feel free.

22          MS. LOBEL:  I'm happy to make some remarks.

23        Number one, I don't think there's any discrepancy

24   whatsoever between what was filed with the Court in support of

25   the application and what the Government has come back with.

1   The figure that is listed on his take-home is after all

2   deductions.  It's not meant to be anything other than that.

3   So, to the extent that that might appear to be a discrepancy,

4   it is not.

5          THE COURT:  And let me say I assumed so, but usually

6   in these situations I have the person here to say, and what

7   kinds of things are deducted, or the check stub or something,

8   and I don't have any of that.  And so I'm just trying to go

9   forward with --

10         MS. LOBEL:  Of course, Your Honor.

11         THE COURT:  -- what I have.

12         MS. LOBEL:  And I'm sure that Mr. Price would be more

13  than happy to do that.  His salary is -- certainly, it's

14  published regularly on the front page of the *Dallas Morning*

15  *News*, --

16         THE COURT:  Right.

17         MS. LOBEL:  -- as the case is tried --

18         THE COURT:  Right.

19         MS. LOBEL:  -- repeatedly in the newspaper, for

20  reasons I can't quite fully grasp.  But in any event, that's

21  not a misrepresentation or anything that even belongs in that

22  universe.

23         THE COURT:  Uh-huh.

24         MS. LOBEL:  It's just what his take-home pay is.

25         THE COURT:  But it's not -- you will agree with me

1  that it's not a complete representation, without knowing what

2  is coming out of his salary.

3          MS. LOBEL:  I wouldn't characterize it as incomplete,

4  but I would be more -- that's what his take-home pay is.  But

5  he's more than happy to provide his check stubs.  And frankly,

6  I'm sure that, had it been known that that was needed, that's

7  precisely what would have occurred.

8      I don't think that -- I think these cars are what's known

9  in the law as a (incomprehensible).  I don't think there's

10 anything about these -- I think if you put these cars up for

11 auction tomorrow -- and the Government may or may not be aware

12 of this -- but if you put these cars up for auction tomorrow, I

13 agree with Mr. Ravkind's observation that this wouldn't get us

14 halfway to first base.  But those are indeed assets he has, and

15 assets that have been disclosed.

16     You have a situation where the amount of work, we're not

17 even getting to trial yet.  I understood what the Court was

18 saying on that.  Let's talk about this stage of the

19 proceedings, if I'm reading the Court correctly.  This stage of

20 the proceedings, you have a -- nearly-unprecedented accusations

21 against a sitting public official where a majority of his

22 assets that could be used to defend himself have been seized by

23 the Government for a period of time.  You have an accusation

24 that covers 10 years.  I began -- I have read the indictment,

25 and I began counting the number of factual assertions in the

1  indictment, and I kept having to redo it because there were so

2  many.  But it is not a misrepresentation to say to the Court --

3  I'm sure the Court's read the indictment but probably hasn't

4  counted the assertions -- there are hundreds of those.

5      The Court has spoken of discovery.  I'd like to say this

6  about discovery in Commissioner Price's defense.  Discovery is

7  the single most important thing that is going to occur at this

8  stage of the proceedings for defending him.  What the Court has

9  said today about these assets being sufficient to hire a

10  qualified lawyer for this case -- and let me just say that for

11  this type of case, in this region, respectfully, there aren't

12  dozens and dozens of lawyers, frankly, who are qualified for

13  this kind of case.  It is not merely complex; it is a highly

14  complex federal case.  It's a first magnitude case.  And as Mr.

15  Ravkind observes, it's beyond anything he's ever seen, and he's

16  kind of seen it all.

17      In the very context of discovery, *Wardias v. Oregon* says

18  you've got to at least shoot for a level playing field.  The

19  very notion that what Commissioner Price is confronting here is

20  a level playing field is, and I mean this with utmost respect

21  to the judicial system, is pure bunk.  There is not a level

22  playing field.  There's nothing even remotely approaching a

23  level playing field.  And the only thing that will achieve that

24  is for him to have adequate legal representation by persons

25  qualified in this kind of case, and to have a person who is

1  doing -- conducting the discovery and processing it who has

2  some appreciation of what the issues are in a case.

3      Now, we have four defendants in this case.  We have one

4  who's a little different from the others in some respect who's

5  had none of his assets seized.  He's not had his arms tied

6  behind his back as he tries to mount a defense.  And I think --

7  I want to -- I'm kind of wandering, and you'll have to forgive

8  me, but I'd like to go back to the representations.  The

9  representations are to the tax value of, for example, his

10  residence.  But that residence is leveraged beyond its value,

11  if I even read what the Government had to say correctly.  There

12  is a rental property and some cars that are unencumbered, and

13  that's it.  I think every -- I mean, we can certainly --

14          THE COURT:  Now, I've not made any reference to his

15  residence.

16          MS. LOBEL:  No, --

17          THE COURT:  But I did make reference, when I talked

18  about real property, to the rental property, just to be clear

19  what I was speaking of.

20          MS. LOBEL:  That is absolutely accurate.  I did not

21  misunderstand the Court.  I did not speak clearly.  What I was

22  referring to was when the Court said the values that the

23  Government pointed to are different than the values in Mr.

24  Price's motion.  And my only point is that motion used tax

25  values and identified them as such.

1      The only other thing was the campaign funds.  I didn't

2  realize they'd designated a particular amount in there, --

3           THE COURT:  Yes.

4           MS. LOBEL:  -- but there was a reference to that.  And

5  the other thing was the community defense fund, which was

6  raised in the aftermath of the seizure of -- the first of

7  three, I believe would be correct, seizures of his assets.  And

8  when that was done, the community raised some monies to support

9  him.  And I will represent to the Court I don't know the exact

10  amount of that, but it was under $40,000 total.

11          THE COURT:  Let me ask you this.  How can I know, I

12  mean, what would be the best course to take so that I know

13  what's in that fund, what's in the campaign fund, what those

14  assets would or might sell for if there's any interest at all

15  in anybody buying them?

16          MS. LOBEL:  To --

17          THE COURT:  What would be the best course for me to

18  take in order to know those things?

19          MS. LOBEL:  Well, I don't quarrel at all if the

20  Government's making a representation to the Court that that's

21  the amount of money in there.  I have no idea what it is.  I

22  don't think you have to compel them to go and get that money.

23      As far as the defense funds from three years ago, the money

24  that was collected then, I can represent to the Court as an

25  officer of the Court that the number of hours I have spent on

1  Mr. -- on Commissioner Price's behalf have far exceeded that

2  amount of money and those were -- those have been depleted,

3  just in terms of the assistance I've afforded to Mr. Ravkind.

4       I do think it's very important to again stress, with

5  respect to both the number of factual assertions in this

6  indictment and the amount of discovery in this case,

7  respectfully, Your Honor, I think in -- you're posing something

8  that makes it impossible for him to defend himself.  You've got

9  6.5 terabytes of information, and a lot of other information as

10 well.  Just to give the Court one example, Mr. Ravkind was told

11 this week that in order to get one item of additional evidence,

12 the Commissioners Court's recordings, which certainly will be

13 essential, that he needed to provide a 2-terabyte hard drive in

14 order to get that.  We are now up to 8.5 terabytes and still

15 counting.  There is a lot of more material that's involved.

16 We're getting very close, at the end of the day, I'm going to

17 wager, to 10 terabytes of information.

18      In the case the Court mentioned a moment ago, and this will

19 be familiar to the Court, maybe not to everyone else, but 10

20 terabytes of information in that case, as a matter of the

21 official record as stated by both the Court and the Government,

22 is the equivalent of the printed volumes of the Library of

23 Congress.  And you're asking someone with some cars that he has

24 restored over the years and one --

25           THE COURT:  So, let me ask you this.  So, you think

1   that he should be appointed attorney or attorneys and that he

2   should still retain the monies that are in his campaign fund,

3   any other monies he has out there, not have to pay anything

4   from his own salary, keep his cars, keep the house he doesn't

5   live in, and the Government should just pick up the tab for his

6   lawyer at this point?  Or lawyers?

7           MS. LOBEL:  I think, given the measures the Government

8   has seen fit to use in this case, which have left him without

9   the realistic ability to defend himself in a way where the

10  lawyers are reasonably compensated, I think that that is very

11  much the case.

12      Let me say some -- let me make a few comments about the

13  campaign fund.  A campaign fund exists for a public official --

14  who, by the way, has been convicted of nothing -- a public

15  official has a campaign fund because people have contributed to

16  his campaign in order that he may secure his position and

17  attain reelection.  Respectfully, I think that to require him

18  to use that money for another purpose is -- violates either the

19  Tenth or the Eleventh Amendment, I can't remember which one it

20  is, but I also think that it does an injustice to the people

21  who have contributed that.

22          THE COURT:  You know, every day, though, defendants

23  pay for their own defense, and they use money and they're

24  acquitted.  It's unfair that they use their money and they're

25  acquitted, but it doesn't change the fact that they have to use

1  their resources to mount a defense.

2          MS. LOBEL:  But Your Honor, respectfully, I think the

3  Court is urging a result that is --

4          THE COURT:  I'm not requiring him to use anything.  My

5  sole determination is whether or not he has the resources to.

6  Whether he decides to or not, or whether any particular

7  attorney, you or Mr. Ravkind, decides that you're going to

8  represent him or not represent him if he doesn't, is a whole

9  separate issue than the one that I'm confronted with today,

10 which is, looking at his body of resources, is it sufficient

11 for him to hire an attorney?

12         MS. LOBEL:  His body of resources are the cars, the

13 home in which his son lives, and the funds that are in -- his

14 campaign funds.  And the question is --

15         THE COURT:  And that portion of his salary.  That

16 doesn't --

17         MS. LOBEL:  And his -- and a portion of his salary.

18         THE COURT:  Uh-huh.

19         MS. LOBEL:  I think it would be -- I respectfully

20 suggest -- and I understand the Court's caution about doing

21 this exactly correctly.  The truth is that, in doing

22 calculations of the number of -- absolute minimum number of

23 hours -- and perhaps it would be useful to have representations

24 from the Government as to the amount of time that Government

25 personnel have devoted to this case, I'm going to say over the

1   last five years.  We know there have been three years since the

2   search warrant and we know there was a considerable period of

3   time before that.  So we know we have probably five years of

4   time from various federal agencies, not just one, not to

5   mention personnel from the U.S. Attorney's Office, not merely

6   attorneys but their support personnel, and agents and their

7   support personnel.  And I would be willing to bet that an

8   accurate representation or estimate of that amount of time

9   devoted to this case would be interesting on so many levels,

10  but certainly on the economic level.  Because we are asking a

11  man whose assets have been seized by the Government to go into

12  court with $60,000, some portion of his salary, and trying to

13  sell his -- the son -- and I don't think the Court's

14  responsible for housing Commissioner Price's son.  Please don't

15  misunderstand that.  But if you put all of that money in a pile

16  -- and I wouldn't put the cars there if I were the Court, but

17  if the Court cares to -- it's not going to be enough to hire

18  what he needs for this case.  And when you -- the flip side of

19  the coin we've been discussing is this isn't a one-count bank

20  fraud case from a few years ago.  We're going back in time to

21  2001, Your Honor.  We are trying to reconstruct events and do

22  the discovery necessary to figure out what happened for a

23  period of 10-1/2 or more years.  That is an undertaking that if

24  the courts truly want an even playing field or anything

25  approaching that, you're going to have to devote the resources

1    to make it reasonable.

2         Anyway, the results of a calculation of what's required.

3    An absolute minimum for this period of time would be 3,000

4    hours for an attorney, 1,500 apiece divided between two

5    lawyers, and whoever your discovery person was.  Right now,

6    that's a full-time job.  I appreciate what the Court said about

7    using CJA, whatever the CJA lawyers do.  But does that mean

8    we're going to be utilizing a processor and a retriever of

9    information in the discovery who has the federal criminal fraud

10   background to understand what the attorneys are looking for and

11   what they need?  Does it mean that the processing is going to

12   be done in the best possible way for the defense to retrieve?

13        Commissioner Price is happy to provide anything that the

14   Court needs.  I think his financial finances are fully laid out

15   to the Court.  I think they are woefully inadequate to even

16   remotely attempting to represent him in an effective way.  Just

17   because Mr. Ravkind loves the guy and has represented him for

18   25 years and feels an obligation towards him is not really a

19   fair factor to include in the Court's evaluation.  Two lawyers

20   -- I think Mr. Ravkind's representation in his reply to the

21   Government, that if you took the largest law firm in this area

22   and had them devote the resources that the Government has

23   devoted to this case over time, maybe then you would achieve

24   it.

25             THE COURT:  We don't get to try to make it even.

1          MS. LOBEL:  I know you don't.  But I think the law

2  affords the Court enough latitude to do that which can be

3  realistically achieved.

4     Now, if the Court were to see this as what would be

5  reasonable to devote to his defense, if the Court is saying he

6  should contribute a certain amount, that seems to me another

7  question.  But to look at --

8          THE COURT:  But that's the question that we ask when

9  we appoint attorneys.  That's one of the things I decide.  I

10  decide whether or not he is indigent and --

11          MS. LOBEL:  He's not indigent.

12          THE COURT:  Or not indigent, but whether or not he can

13  afford to hire his own counsel.  Whether or not he can afford

14  to contribute to it, even if he's not able to fully afford to

15  hire his own counsel.  So, those two things are hand in hand.

16  They're not different inquiries for me.

17          MS. LOBEL:  No, I understand, Your Honor.  And he

18  certainly is a salaried individual.  He has a decent salary.

19  He has assets that are --

20          THE COURT:  Well, let me --

21          MS. LOBEL:  -- commensurate with a person of his

22  standing.

23          THE COURT:  Let me ask you this, since he's not here.

24  Normally, I would ask him.  Is that his signature, Mr. Ravkind

25  --

1          MS. LOBEL:  Yes, Your Honor.  Yes.

2          THE COURT:  -- or Ms. Lobel?

3          MS. LOBEL:  Yes.

4          THE COURT:  And it does say that it's under penalty of

5    perjury that he signed this, so I'm assuming that his estimate

6    of his monthly payments is correct, to the best of his

7    knowledge and ability at the time, --

8          MS. LOBEL:  I believe so, Your Honor.

9          THE COURT:  -- which it looks like to me they come up

10   to approximately $4,000 a month.  Is that what you saw?

11         MS. LOBEL:  I don't have it in front of me, --

12         THE COURT:  Okay.

13         MS. LOBEL:  -- but if that's the -- what was filed and

14   that's what's on there, I would say --

15         THE COURT:  And he's saying he's taking home $6,500 a

16   month approximately?

17         MS. LOBEL:  That's what his check comes to.

18         THE COURT:  And I'm assuming that out of his check,

19   just because I know what comes out of mine, he's probably

20   paying into some kind of retirement thing in addition to that?

21         MS. LOBEL:  That, I can't -- that, I can't verify.

22         THE COURT:  His taxes, unless he's got some

23   garnishment from the federal government, are not going to come

24   up to the difference between the two.

25         MS. LOBEL:  No, no, I am sure there are other items --

```
 1              THE COURT:  Okay.

 2              MS. LOBEL:  -- taken out of his check.

 3              THE COURT:  Okay.

 4              MS. LOBEL:  I just can't tell the Court --

 5              THE COURT:  Some items are necessities and some

 6 aren't.  That's why I'm asking.

 7              MS. LOBEL:  Absolutely.

 8              THE COURT:  And I can't tell from this.

 9              MS. LOBEL:  And I would wager, I don't know this for a

10 fact, but I would wager one of those deductions is a car.

11              THE COURT:  Uh-huh.

12              MS. LOBEL:  Cars seem to feature prominently in his

13 life.

14              THE COURT:  They do.  Okay.  And Mr. Ravkind, were you

15 asking for yourself to be appointed as CJA counsel and an

16 additional CJA attorney appointed to this case?

17              MR. RAVKIND:  Yes, ma'am.

18              THE COURT:  And that would have been you, Ms. Lobel?

19              MR. RAVKIND:  Ms. Lobel.

20              MS. LOBEL:  That is who Mr. Ravkind was requesting.

21              THE COURT:  Okay.  Are you both still on the CJA list?

22              MS. LOBEL:  Yes.

23              THE COURT:  Okay.  Are you on the CJA list, Mr.

24 Ravkind?

25              MR. RAVKIND:  I don't know.  I was the first one ever
```

1   on it, so I don't know if I'm still on it or not.

2          THE COURT:  Okay.

3          MR. RAVKIND:  I still --

4          THE COURT:  I'm going to assume you're on it, and if

5   you're not on it, you're going to get on it really quickly.

6          MS. LOBEL:  I know he's had CJA appointments.  Wasn't

7   that -- yeah.

8          THE COURT:  Okay.  Based on the complexity of this

9   case, I'm going to find that Mr. Price cannot afford to hire

10  competent counsel without the assistance of taxpayers, so I'm

11  going to appoint CJA counsel to represent him, Mr. Ravkind and

12  Ms. Lobel.

13     However, I do find that Mr. Price can contribute to the

14  cost of his attorneys.  I'm going to order him to deposit in

15  the registry of this Court, no later than October 15th,

16  $60,000.  And I'm going to order that he pay into the registry

17  of the Court during the pendency of this case, taking into

18  consideration his rental property, his -- that he -- his

19  illiquid assets as well as his salary, the sum of $2,000 per

20  month.  So, that $2,000 per month will be -- how often does he

21  get paid, do you all know?  How does the County pay?

22          MS. LOBEL:  I'll bet Mr. Junker knows that better than

23  I do.

24          THE COURT:  Do you, Mr. Junker?

25          MR. JUNKER:  Judge, if memory serves, it's twice

1    monthly.

2          THE COURT:  Twice monthly?  I'm going to make, then,

3    that be payable twice monthly, $1,000 payments, on the 16th of

4    each month, the 1st and the 16th of each month.  And I'm going

5    to start those on October 1st.  October 1st.

6       So, Mr. Price will be required to pay $60,000 into the

7    registry of the Court no later than -- how long did I say I was

8    giving him for that?

9          THE CLERK:  The 15th of October.

10         THE COURT:  The 15th of October.  And will make

11   periodic payments of $1,000 each on the 1st of October and the

12   -- starting the 1st of October, on the 1st of each month and

13   the 16th of each month.

14      Now, we have an order that will set all of this out.  I

15   don't think that we have the order right here, but we'll get

16   the order and it will state that.  It's as good as it's going

17   to get today.  So, if Mr. Price -- I will give him veto power.

18   If he does not want this order to be entered, then please let

19   me know by the end of day today.

20         MS. LOBEL:  Thank you, Your Honor.  Will the Court be

21   providing a copy of the order for us to review before you

22   actually enter it?

23         THE COURT:  Okay.  It's a form order.

24         MS. LOBEL:  Okay.

25         THE COURT:  Because we do it all the time.  But --

1        MS. LOBEL:  We have what the Court --

2        THE COURT:  Okay.  It's a form order.  But I'm not

3   going to enter it before tomorrow morning.  That will give you

4   an opportunity to let me know if that's not something that he

5   wants to go forward with, because it is requiring much of him.

6      Yes, Mr. Junker?

7        MR. JUNKER:  Judge, I'm not certain that this is

8   appropriate, given the subject matter of the hearing, but it's

9   been brought up repeatedly, and that is discovery in this case.

10  I would also ask that the Government be informed whether or not

11  Mr. Price will be participating in the joint discovery --

12       THE COURT:  Now that Mr. Price has CJA counsel, I

13  assume so.

14       MR. JUNKER:  I just need an answer, because it's

15  holding up the discovery.  And understandably, Mr. Ravkind

16  wanted to wait until after this hearing to decide.

17       THE COURT:  We were trying to get to it as soon as we

18  could.

19       MR. JUNKER:  I'm sorry.

20       THE COURT:  That's why we expedited the responses.

21  But as soon as we know today.  Once he has CJA counsel, if he

22  decides to go that way, then he's entitled to share in.  So, --

23       MR. JUNKER:  Thank you, Your Honor.

24       THE COURT:  Okay.  Yes, ma'am?

25       MS. LOBEL:  I just wanted --

1          THE COURT:   You have now -- you've been appointed

2  provisionally.  Go right ahead.

3          MS. LOBEL:  So I may speak officially?

4          THE COURT:  Yes.

5          MS. LOBEL:  I just wanted to say that there have been

6  -- there is an ongoing discussion with the Government about

7  various discovery issues and how to best proceed it that are

8  large and multifaceted, but we will proceed expeditiously.

9          THE COURT:  Right.  And Marlo -- that's not her last

10  name.

11          MR. JUNKER:  Marlo Cadeddu?

12          THE COURT:  Marlo Cadeddu, Ms. Cadeddu, is going --

13  has volunteered to coordinate for --

14          MS. LOBEL:  That's very nice of Ms. Cadeddu, and we

15  appreciate it.

16          THE COURT:  -- the Defendants the --

17          MS. LOBEL:  But Mr. Price --

18          THE COURT:  -- electronic discovery.  Go ahead.

19          MS. LOBEL:  Mr. Price will respectfully ask to handle

20  that matter, to have his counsel handle that matter, rather

21  than to have someone else's counsel do so.  But I don't want to

22  burden the Court with that now.  I just didn't want to not say

23  anything in response to the Court.

24          THE COURT:  After we resolve this issue regarding Mr.

25  Price's counsel, --

```
 1             MS. LOBEL:  Uh-huh.

 2             THE COURT:  -- I'll be issuing an order requesting

 3   budget proposals from each of defense counsel appointed in this

 4   case, because, realizing that this is an extraordinary case,

 5   the budget will have to be preapproved, --

 6             MS. LOBEL:  Of course.

 7             THE COURT:  -- the proposed budget.  And you've done

 8   that before.  And so we'll get to that process as soon as we're

 9   done with this particular motion, which is kind of --

10             MS. LOBEL:  I just wanted to make sure --

11             THE COURT:  -- a monkey wrench in things.

12             MS. LOBEL:  -- we were on record in response to --

13             THE COURT:  I appreciate that.

14             MS. LOBEL:  -- what the Court said.

15             THE COURT:  I appreciate that.

16             MS. LOBEL:  Thank you, Your Honor.

17             THE COURT:  You don't have to share in if you don't

18   want to share in, but there's going to be limited funds

19   available for the electronic discovery.

20             MS. LOBEL:  And that's why we have gone to the

21   Government with a proposal that we're discussing now.

22             THE COURT:  Okay.

23             MS. LOBEL:  Thank you.

24             THE COURT:  All right.  Anything else related to this

25   matter we can take up today?  Because I think this matter is
```

1    the only thing that I have that I have authority to take up

2    today.

3            MR. JUNKER:  Not from the Government, Your Honor.

4    Thank you.

5            THE COURT:  Okay.  Then we're adjourned.  Thank you.

6            MS. LOBEL:  Thank you, Your Honor.

7            THE CLERK:  All rise.

8        (Proceedings concluded at 11:19 a.m.)

9                              --oOo--

10

11

12

13

14

15

16

17

18

19

20                          CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the digital sound recording of the proceedings in the above-
22    entitled matter.

23    **/s/ Kathy Rehling**                        **10/06/2014**

24    _____    _____

25    Kathy Rehling, CET**D-444                 Date
     Certified Electronic Court Transcriber

1                                    INDEX

2  PROCEEDINGS                                                            3

3  WITNESSES

4  -none-

5  EXHIBITS

6  -none-

7  RULINGS                                                           16/33

8  END OF PROCEEDINGS                                                    38

9  INDEX                                                                 39

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25