IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | 3:14-CR-293-M |
| | § | |
| JOHN WILEY PRICE (01) | § | |
| KATHY LOUISE NEALY (02) | § | |
| DAPHENY ELAINE FAIN (03) | § | |
| CHRISTIAN LLOYD CAMPBELL (04) | § | |

**DEFENDANT CHRISTIAN LLOYD CAMPBELL'S RESPONSE TO BEARINGPOINT TRUST'S MOTION FOR A PROTECTIVE ORDER**

The Liquidating Trust for BearingPoint, Inc. ("BearingPoint") incurs costs of $20,000 per month maintaining records associated with BearingPoint's bankruptcy, an admittedly extraordinary amount that spends assets that would otherwise flow to BearingPoint's beneficiaries. While defendant Christian Lloyd Campbell (Campbell) understands the impact of these expenditures, he is unable to agree to the destruction of BearingPoint records for one simple reason: because the government has yet to produce discovery to the defendants, Campbell has no way to know whether the destruction of BearingPoint documents would include those that are critical to his defense. Accordingly, Campbell respectfully requests that the Court deny BearingPoint's motion for a protective order.

Facts

Prior to the indictment returned on July 23, 2014, the government had been investigating the alleged bribery scheme for nearly four years. The government issued its first subpoena to BearingPoint on July 11, 2011, (Motion ¶ 9), and after having more than two years to review the BearingPoint returns, asked for additional information by subpoena on November 22, 2013, (*id*.).

BearingPoint records are critical to Campbell's defense. As described in his motion for a severance, Campbell is charged with limited conduct in furtherance of the alleged conspiracy. While very little of the indictment has to do with him, Campbell is linked to BearingPoint (known as "Business B" in the indictment) in paragraphs 58, 62, and 65. (Indictment ¶¶ 58, 62, 65.) Although the alleged conduct as it pertains to Campbell occurred in 2004 and 2005, he is charged within the statute of limitations only by the allegation of a single conspiracy encompassing multiple independent schemes.

None of the information that the government obtained from BearingPoint has been turned over to the defense as of the filing of this response. The government has told the defendants that production of the discovery material will take approximately five months, with each production made in 500 gigabyte increments, and that it is unable to determine the order in which materials will be provided.[1] The government has also delayed production of discovery materials so that it could seek a protective order from the Court, which it did by motion filed late yesterday.

Argument

BearingPoint's argument in support of its motion boils down to two core points: first, that maintenance of the records is harshly expensive; and second, that "the breadth of production to the USAO makes it seem unlikely that additional relevant information will be found." (Motion ¶ 32.)[2] Campbell does not disagree with the first point.

---

[1] In other words, BearingPoint materials could be produced in any of the five months after production of discovery begins.

[2] Campbell also acknowledges that all communications with BearingPoint have been amicable, with both sides fully understanding the other's position. The decision to request that the Court intervene is in no way an indictment of these conversations. Instead, it is a mutual understanding that this is not a traditional discovery dispute, but rather one that involves balancing two competing interests – cost vis-à-vis the bankruptcy court and liberty vis-à-vis this Court – as well as counsel's obligation to provide zealous representation.

The second point offers significantly more concern. In the absence of having been provided any discovery materials – specific to BearingPoint or otherwise – it is impossible for Campbell to determine whether the government's subpoenas captured all relevant information. The government is tasked only with proving a charged defendant guilty beyond a reasonable doubt. Its only obligation with respect to exculpatory material is that it turn over what it already has in its possession, not that it specifically seek out such material. Accordingly, while the government's subpoenas capture information relevant for *its* case, the subpoenas do not address materials that may support *Campbell's* position.

Also, without having seen the discovery materials, Campbell cannot determine whether those materials may lead to the identification of other materials that were not subpoenaed by the government. Indeed, that is exactly how the government proceeded: two years *after* it reviewed records subpoenaed from BearingPoint, it issued another subpoena for more records that it presumably identified after conducting additional investigation. That avenue is precisely what is denied to Campbell if the BearingPoint records are destroyed.

BearingPoint's proposed solution is also predicated on a chain of assumptions, largely based on what the government determined. Buried in the chain of assumptions is the fact that there may indeed be relevant information that the government simply omitted from its requests based on time or expense. For example:

- The government only looked at eleven of the hundreds of former BearingPoint employees. (Motion ¶ 14.)

- The government negotiated the restoration of only a time-limited portion of relevant files. (*Id.* ¶ 15.)

- The government agreed to limit the restoration of backup tapes to only six of the eleven former Bearing Point employees. (*Id.* ¶ 16.)

- The government limited restoration to one tape every twelve days. (*Id.* ¶ 17.)

- The government did not ask for certain tapes to be restored because "it determined that the likelihood of finding relevant material on these tapes was low." (*Id.* at 6 n.3.)

- The government did not ask BearingPoint to search other materials, "finding it unlikely to include relevant information." (*Id.* ¶ 21.)

It is for this reason that BearingPoint concedes that "cannot know that *all* potentially relevant information" on the backup tapes was provided to the government, (*id.* at 11 n.7), and that its proposed solution would not save all, but rather "nearly all of the potentially relevant emails," (*id.* ¶ 43).[3]

Moreover, BearingPoint's proposed end date of February 28, 2015, does not allow Campbell the opportunity to review the government's discovery materials to identify additional relevant BearingPoint files. Even if the government began providing discovery materials immediately in its proposed 500 gigabyte increments, production would not be complete until February 2015.

Finally, Campbell's subpoena is both specific and demonstrably relevant in light of the scope of the government's indictment in this case, and should not be quashed. While BearingPoint highlights the "more than thirteen year period" that the subpoena covers, it in fact overlaps with the time period of the conspiracy – a "continuing conspiracy" – alleged in the indictment. Moreover, despite BearingPoint having 27,400 cubic feet of hard copy records, (*id* ¶ 1), 14,500 backup tapes, (*id.*); 2000 clients, (*id.* ¶ 8), materials "at locations around the country," (*id.* ¶ 20), and hundreds of former employees, Campbell limited his request for the records to those of just fourteen individuals. And these fourteen individuals were identified through

---

[3]      BearingPoint suggests that the materials lost would be limited to those where an individual deleted an email and then emptied the "Deleted Items " folder. Where there are allegations of a criminal conspiracy, it does not appear to be a stretch to surmise that this occurred.

government documents, filed publicly and otherwise, that linked them in some way to the alleged conspiracy.[4]

Campbell is willing to amend its subpoena and remains willing to work with BearingPoint to ensure that the relevant documents are preserved at a reasonable burden that BearingPoint could bear. However, the proposed solution – which includes the destruction of correspondence and an end date before all of the government's discovery is produced – may damage Campbell's ability to defend himself.

Conclusion

With a three-year head start on its investigation, the government was able to make repeated requests for records from BearingPoint before securing an indictment. Now, BearingPoint is requesting that Campbell – without having seen any discovery materials from the government – agree to the destruction of records that may contain materials that assist in Campbell's defense. BearingPoint's financial interest must give way, at least in part, to Campbell's liberty interest. Accordingly, Campbell respectfully requests that the Court deny BearingPoint's motion for a protective order and assist the parties in crafting relief that appropriately balances the interests of cost and liberty.

---

[4] Admissibility is derived from two sources: first, representatives from BearingPoint can authenticate any of the business records, and second, the fourteen individuals can authenticate their own correspondence.

Respectfully submitted,

BRACEWELL & GIULIANI LLP

/s/ Shamoil T. Shipchandler
Shamoil T. Shipchandler
Texas Bar No. 24028533

Terence J. Hart
Texas Bar No. 09150700

1445 Ross Avenue, Suite 3800
Dallas, Texas 75202-2711
Tel: (214) 758-1048
Fax: (800) 404-3970

Attorneys for Christian Lloyd Campbell

## CERTIFICATE OF SERVICE

I provided a copy of this document to all counsel of record by electronic filing.

Dated: October 15, 2014

/s/ Shamoil T. Shipchandler
Shamoil T. Shipchandler